IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

*[handwritten annotation in top right margin, illegible signature]*

James Odell Baxter, II
No. 27161-016
FCC Petersburg

**FILED**

JAN 2 ~ 2017

U.S. DISTRICT COURT

              Petitioner,

vs.                                           Case No. 03-516 (RJL)

UNITED STATES  OF AMERICA


              Respondent.




Supplement to <u>MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE</u>
        <u>PURSUANT TO 28 U.S.C. § 2255 AND MEMORANDUM OF LAW IN SUPPORT</u>




                                    James O. Baxter, II, Pro Se
                                    FCC Petersburg
                                    P.O. Box 1000
                                    Petersburg, VA 23804

## STATEMENT OF CASE

On November 20, 2003, James Odell Baxter ("Baxter") was
indicted on 27 counts, including one count of Conspiracy, 18 U.S.C.
§ 371; five counts Wire Fraud and Deprivation of Honest Services,
18 U.S.C. §§ 1343,1346; three counts of Mail Fraud and Deprivation
of Honest Services, 18 U.S.C. §§ 1341,1346; as well as related
multiple offenses of false statements, money laundering, embezzlement,
and theft arising from schemes to defraud the Washington Teachers'
Union ("WTU").

On May 31, 2005 the trial began. The Trial court granted
Baxter's mid-trial motion for acquittal in part in Counts 2,3,4 and
6 charging wire fraud. At the end of the defense case, Baxter's
motion for judgment of acquittal on remaining 23 counts was denied.
On August 31, 2005, Baxter was convicted on all remaining counts in
Indictment. On June 5, 2006, Judge Richard J. Leon sentenced Baxter
to 120 months imprisonment. A notice of appeal was filed on June 14,
2006. Appelant's Brief was filed June 12, 2007 and Oral Hearing was
held November 15, 2007. District of Columbia Circuit Court affirmed
conviction February 8, 2008. A Petition for Rehearing and Hearing
En Banc was filed March 24, 2008, denied April 11, 2008. A Writ of
Certioarari was filed September 8, 2008, on January 12, 2009 Supreme
Court entered its final order denying certiorari. On September 16.
2009. by letter motion to the Office of Clerk, District Court, and
pursuant to Criminal Justice Act, Baxter requested Court's permission
for legal assistance and cost associated with filing § 2255 Motion,
local forms, rules and procedures. On November 1, 2009 a follow-up

Letter request for status of letter motion filed September 16, 2009 regarding § 2255 Motion with the District Court was filed: Clerk of the Court has not yet responded as of the filing of this Motion. Baxter now comes before this Court pursuant to 28 U.S.C. § 2255.

## JURISDICTION

Pursuant to 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, ... or is othewise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

## REVIEW STANDARDS

A motion for relief under § 2255 follows the procedures established by the "Rules Governing Section 2255 Cases in the United States District Courts" (hereinafter, the "Rules"). The text of § 2255 states that, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255 (emphasis added). Similarly, the Rules dictate that, upon initial consideration by the assigned District Judge, a 2255 motion should be dismissed only "if it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." Rule 4(b) (emphasis added). In all cases, "the judge may order the United States attorney to file an answer, motion, or other response

2

within a fixed time, or to take action the judge may order." Id.
The Rules also authorize, where appropriate and by order of the
Court, discovery proceedings, an expansion of the record, and an
evidentiary hearing.

Subsequent to the "Preliminary Review" stage set out in Rule
4, the ultimate legal standard for motions brought pursuant to
§ 2255 is prescribed by statute:

> If the court finds that ... the sentence imposed was not
> authorized by law or otherwise open to collateral attack,
> or that there has been such a denial or infringement of the
> constitutional rights of the prisoner as to render the
> judgment vulnerable to collateral attack, the court shall
> vacate and set the judgment aside and shall discharge the
> prisoner or resentence him or grant a new trial or correct
> the sentence as may appear appropriate.

28 U.S.C. § 2255

## STATEMENT OF FACTS

In 1994 Baxter was elected Treasurer of the Washington Teachers'
Union ("WTU") on a slate with Barbara Bullock, President, and Esther
Hankerson, General Vice-President.(Tr. 605-606,771-772). From date
of hire until departure in 2002, Baxter had no agreement, motive, or
intent to provide dishonest services, defraud, or steal from the WTU.

Baxter's full-time paid position as treasurer was mandated
by the WTU Constitution.(Tr. 1381-82,1800). However, beyond basic
duties, his principal job was in the position of Legislative
Representative, lobbying on the behalf of WTU.(Tr. 646,654-55,727,
1349-50,1417-18,1784-1797). Baxter also served as the WTU liason to
the District of Columbia Teachers Retirement Board and drafted
letters, speeches, and D.C. Council, School Board, and U.S. Congress
testimony for Bullock, and to a lesser extent Hankerson.Id. Although
the treasurer duties under the Constitution and Bylaws included

3

receiving and disbursing funds and maintaining financial records,
the Union had always employed an experienced bookkeeper and office
manager/assistant to the President to conduct the daily accounting
and record keeping function.(Tr. 778,881-891). Initially Santi
Medina, bookkeeper, and Martha Britton, Executive Assistant to
President, handled all financial responsibilities, including to
review bills and prepare vouchers and checks for signing, reconcile
bank records, prepare financial documents such as IRS 990, LM-2
DOL report, quarterly report, and maintain the union's financial
records.(Tr. 604,609-15,657-64,690,881-84,932-38,1780,2920,2942-44,
3014). Financial information presented to the board (e.g. quarterly
report and draft budget) was provided by Medina and Britton, and
presented by Baxter.(Tr. 678-9). As was standard practice in
prior adminstrations, Britton on occasion gave Baxter blank checks
to pre-sign to expedite payment of bills in his absence.(Tr. 615,1930).

An American Express account was opened for WTU and Bullock,
Hankerson, and Baxter received cards.(Tr. 619,1760-61). There were
no policies established regarding use of American Express ("Amex")
cards.(Tr. 892,983,990-01,1576). Baxter was designated "program
administrator" for the account (Tr. 1760-61),however all billing
statements were delivered to Britton, assistant to President.
Bullock instructed Britton to pay Amex bills and how to account for
them.(Tr. 620,624-25,635-36,662-63,1543-44). There was authorization
to use card for meals, auto, and related business expenses.(Tr. 832-
833,895-901,1048,1798-99). Unrelated business expenses were to be
reimbursed.(Tr. 988-98,1031,1038,1341-42,1441-46). In addition,
Baxter was allowed a $300 per month stipend.(Tr. 1799). At trial
Baxter first learned Bullock charged items on his Amex card without

4

his consent (Tr. 1837), and forged Hankerson's signature on large checks made to herself.(Tr. 783-84,791-97,801,992-93,1--1-1004, 1010-11,1597-98,1837). Only Bullock, Hankerson and Baxter had check signing authority, so the amount on Bullock's forged checks would circumvent Baxter's review. However, Hankerson discovered it through a bank conversation, confronted Bullock, but never informed Baxter, the board, or trustees because she wanted to avoid a scandal and believed Bullock's answer that she would repay it.(Tr. 995-6,1005).

Unknown to Baxter, Britton informed him that Bullock's expenditures appeared exclusively personal and exceeded $10,000 a month.(Tr. 620-621,629,1261,1264-65). Initially, Baxter asked Britton to withhold payment on further Amex bills.(Tr. 630-32,634,644,652-54). Once Bullock's subsequent purchases were denied, she became enraged with Baxter and made clear it should not happen again.(Tr. 627-8). Despite Bullock's reprimand, Baxter told Britton, "the spending has to stop."(Tr. 632). To control Bullock's spending, Baxter on two separate occasions, verbally in January 1996 and in writing March 28, 1996, instructed Dina Perez at American Express to put a $5,000 global spending limit on WTU account.(Tr. 666-677,1761-1764). As the only internal control Baxter could establish, it allowed his review and approval for any WTU expenditure over the limit -- even if he did not see actual bills.

In latter part of 1996 Britton was replaced by Gwendolyn Hemphill. (Tr. 649,960). Medina died of cancer fall 1997 and Bullock and Hemphill decided he would not be replaced, and Hemphill would handle all the finances, and maintain exclusive possession of all the union's financial records, review and pay the bills.(Tr. 782,885-86,888,932-

933,941-42,980-81,1559,1563,1568-69,1575,2920,2942,2987-90). Before
Hemphill, only the bookkeeper prepared payroll and cut checks after
review of vouchers and bills, now Hemphill controlled accounting
process and financial information, including supervision of any
outside accountants.(Tr. 1262,2952,2990).

Baxter left the WTU full-time employment in July 1997 upon
receiving an offer from the Mayor to become Director of Labor Relations
and Collective Bargaining, because the city had been unable to
negotiate contracts for 75% of the workforce the prior three years
and it was under the receivership of the D.C. Control Board. As
chief negotiator for the city, in addition to Bullock, Baxter
reported to the Mayor, Chief Management Officer for D.C. Government,
and Control Board. Bullock advised the WTU board Baxter would remain
part-time with the WTU as treasurer and perform other duties.
Baxter's income was halved, and adjusted proportionate to standard
union contract increases.

In fall 1997, without a bookkeeper and in-house treasurer,
Bullock and Hemphill sought to undermine Baxter's $5,000 spending
limit by first removing him as program administrator, second,
secretly revoking the spending limit and opening a second account
with cards to Bullock and Hemphill only, and finally, forwarding
both account billing statements to Hemphill's home.(Tr. 1367,1379,
1592-95,1760-72,1776-78,1883-84,1886,1892-94,1900-1901). Bullock
testified that changes to the Amex account were done without Baxter's
knowledge,and he was not authorized to use second account.(Tr.1778,
1837). The subsequent spending skyrocketed.(Tr. 1673,1771).
Simultaneously without Baxter's knowledge, Bullock and Hemphill

devised other schemes to hide the nature and amount of their use
of Amex accounts.(Tr. 1686,1691), since they had control of any check
and balance for WTU finances. One scheme involved Hemphill writing
pre-signed blank checks to Bullock's driver, Leroy Holmes, who
cashed them,kept a portion, and returned the remainder to Hemphill.
(Tr. 3021-22,3033,3632-34). Hemphill then deposited cash into
Bullock's bank account.(Tr. 3660-61,3690-91,3696-99,3738-39,3742,
3780). In addition, Hemphill would cross out names of legitimate
payeees on checks and insert Holmes', then forge Baxter's signature.
(Tr. 3671-75,App. 9a,15a). Holmes testified he saw Hemphill
complete and place Bullock's stamp on blank checks Baxter pre-signed.
(Tr. 3671,3677-78). During FBI interview on 11/13/02, 1/16/03, and
1/23/03 Hemphill stated the same.(App.4a,8-9a,12a). Holmes testified
Baxter was not aware of amounts paid to him with the exception of
one occasion when Baxter questioned him over an $1,800 check, and
he lied saying that it was for two weeks pay.(Tr. 3044,3675-78).

Another scheme involved Michael Martin, Hemphill's son-in-law, who
she enlisted to cash checks written to him and to deposit cash into
Bullock's personal bank account.(Tr. 2389,2403-04,2407-08). When
Martin became concerned about the number of checks in his name,
Hemphill assured him the checks were only seen by her.(Tr. 2404,
2429). To better avoid detection, Hemphill proposed another scheme
to Bullock to set up a "company" to write checks to then appear
legitimate.(Tr. 1344-47,1354,1356-57,1582-83,1843,2404). In late
1999, Hemphill and Martin approached his friend, Erol Alderman, about
using his dormant company, Expressions Unlimited, as the ficticious
company.(Tr. 1696,2404-07,2397,2422,2424,2439-43). Martin either

cashed or deposited checks, and then deposited cash or a check drawn
on the Expressions Ulimited bank account into Bullock's bank account
per Hemphill's instructions.(Tr. 2391,2407-09,2426,2428-29,2431,
2433,2436,2444-50,2452,2472-73,2515,2550,2558-59,2666). All of the
above schemes by Bullock and Hemphill were initiated after Baxter
went to work for the city and Medina's death. Baxter had no knowledge
or involvement in any of the transactions.(Tr. 1843) There was no
evidence presented of any kind that Baxter received a "penny" from
these crimes -- even the Government did not allege otherwise.
Alternatively the Government alleged, as treasurer Baxter signed
checks to himself and others for funds they were not entitled, and
he signed checks that paid WTU credit card bills, which made him
a co-conspirator .(Govt. Brief p.38). The record and testimony of
co-conspirators indicated they were not entitled to checks fraudulently
prepared by Hemphill, and by deceit Hemphill used pre-signed blank
checks to funnel cash to their accounts and altered checks to
embezzle cash.(Tr. 3672-73). Nonetheless, the Government pursued a
theory that Baxter was "dishonest" in his services as treasurer,
therefore not entitled to any checks payable for his income or
pension, and designated them as embezzlements. Specifically, as to
pension, Bullock did not want to authorize Baxter to receive his
pension contribution while he worked part-time, but WTU CPA,
Robin klein, informed her that he was entitled to it.(Tr 1384,
1413-17). Baxter received pension payments to his WTU Plan account
or, like Britton and others, directly as cash.(Tr. 717). In June
2002 Hemphill sought approval from Bullock to pay an estimated
$18,000 as part of pension payments owed to Baxter.(App. 7-8a ).

Government concurred, Baxter had had only one pension payment contribution to his WTU retirement account since it was established in 1995. The record indicates Baxter was granted a leave of absence from full-time employment and retained his paid position with the union when he went to D.C. Government, performing similar duties as before but limited lobbying. Throughout that period and upon returning he also worked on various special projects such as, new changes at the federal level on teacher's pension plan, working with the American Federation of Teachers ("AFT") and National Education Association on administering assistance to the families of teachers and students who died in New York and D.C. from the 911 attacks, and working on the Mayor's proposal for teacher's housing incentives. (Tr. 901-05,1379-82,1784-96,1801,2905,4033,4109-4110). In fact, it is because Baxter successfully lobbied and wrote legislative changes for teacher's pensions to increase the city and Congress' contribution and benefits, as well as reduce the eligibilty period for retiring teachers, they now enjoy thousands of dollars of increased benefits earlier for the rest of their lives.(S.Tr. 54).

By June 2000 Baxter returned to full-time duties at WTU. (Tr. 841-46,903,1801-02). Under the Constitution Bullock had the authority to rehire Baxter full-time without board approval, though she advised the Board of Trustees.(Tr. 1375-76,1378,1801-08,1854-55, 2959-2965). The Government never provided any evidence Baxter did not earn his income or dishonestly provided his services, or signed checks payable to him as his private gain for participating in an alleged conspiracy. On the contrary, Government's chief witness to testify against Baxter, Bullock, stated he earned it and was

entitled to it. Nevertheless, the Probation Office and Sentencing Court added Baxter's income and pension in the total financial loss to WTU and used it toward sentencing him.(PSI, S.Tr.) No other alleged co-conspirator's WTU salary or benefits were deemed as embezzled or fraudently and dishonestly obtained. In fact, Leroy Holmes, Bullock's driver, who Hemphill fraudently issued over $1.4 million dollars in non-payroll checks, was credited by the Government and Sentencing Court with $100,000 per year income ($500,000 over 5 yr. conspiracy period).(PSI, S.Tr.). Ironically, Baxter, unlike any other co-defendant or co-conspirator was issued W2 and 1099 IRS filing statements from Hemphill, and he reported and paid taxes to IRS on all income and pension received from WTU. At sentencing the Court determined Baxter's disputed issues of material facts related to his compensation as treasurer and pension, and his entitlement to pay, were immaterial.(S.Tr. 8). The sentencing court stated Baxter's signing of checks used for fraud was proof of his involvement in scheme to defraud WTU and by refusing to sign he could have stopped the scheme; the appellate court stated he should have closed the Amex account and without his signing checks the embezzlement or money laundering would not have happened; and, prosecutors in their Rule 29 Motion Reply stated, the signed checks were the reason for the crimes and Baxter failed to police the union. The record evinces, Baxter never wrote or issued a check at WTU, and it was the responsibility of the assistant to the President. Further, the Constitution indicated the treasurer was a staff person with no administrative authority.(Tr.1381-82). Baxter had no staff.

AFT required union audits (Tr. 1042,1172,1184-86,1500), but

Bullock never authorized an audit of her books after 1995.(Tr. 1340).
During 1999, Linda Jardine of Thomas Havey & Co. was retained to
complete an audit for 1995-1997.(Tr. 1139,1496,1574-75,1784). Bullock
and Hemphill provided Jardine with false Amex information for Bullock
and she never completed the audit.(Tr. 1341,1444-46). Earlier in 1998,
Bullock had also disallowed AFT to enter the office and review the
books.(Tr. 1024,1172-73,1176). Baxter was never informed or the Board.
Later, the WTU was assessed a substantial penalty and deliquency
by IRS because Hemphill and Bullock had failed to file IRS Form 990
for prior years, so they secretly negotiated a payment plan without
Baxter, Hankerson, or the Board's knowledge.(Tr. 1460,1561,1563-66,
1843-44). Hemphill used blank checks to hide payments from disclosure
(App. 4a,12a).

When Baxter returned full-time to WTU he was concerned about
the continuing incomplete vouchers and number of blank checks,
because unlike before, he was more available. Hemphill stated in her
interview on 11/13/02 with the FBI, DOL, IRS, and US Attorney, that
Baxter confronted Bullock because he did not want to sign blank
checks and Bullock went into a rage and threatened to go to the
Executive Board and have him fired.(App. 2a,3a). Subsequent to that
altercation, unbeknownst to Bullock and Hemphill, Baxter began to
keep copies of signed blank checks and encrypted vouchers with an
asterick, if he had signed a blank check for it and no amount or
payee had been designated.(App. 15a-31a ). The encryption was
intended as a reference for future audits to verify payments made
by Bullock and Hemphill that Baxter had pre-signed checks, but did
not know either to whom, or for what amount was written by Hemphill.

11

The FBI's copies were seized from Baxter, and those reviewed along with discovery material match up to altered and embezzeled checks.(App.)

The insolvency of the WTU was kept concealed by Bullock and Hemphill until 2002, when dues to AFT were in arrears by over $650,000 -- 18 months past due. February 2002, Bullock met with Ed McElroy, president of AFT, and negotiated a payment plan.(Tr. 1068-1072,1108,1177,1179,1181,1183-84,1186,1199,1237,1458-59,1505-1506). Baxter was neither invited or informed of the meeting.(Tr. 1108). Bullock informed Hemphill about the meeting and payment plan.(Tr.1459). McElroy confirmed the meeting and payment plan by letter with carbon copies to six people, Baxter, treasurer of WTU, was not one of them. (Tr. 1070-73,1109). Bullock had replaced Baxter with Hemphill as contact person for AFT regarding filing WTU monthly dues reports to AFT and dues payments, which allowed concealment of WTU per capita dues debt with AFT. From fall 1997 these reports bear either Hemphill's signature or a forged signature for Baxter. Bullock testified she and Hemphill knew from their expenditures they could not repay AFT under the agreement -- $50,000 per month and a lump sum $300,000 payment before June 30, 2002, in order for WTU to be able to seat delegates at upcoming AFT convention.(Tr. 1460,1463-65). Bullock testified Baxter did not know that the WTU was in debt and had no money to pay.(Tr. 1465). If the WTU could not attend "AFT" convention, Bullock had to answer to the Board and membership. Bullock and Hemphill agreed on a scheme to get money by an overcharge on retroactive dues owed from teachers in a newly negotiated contract (Tr. 1462-65,1506,1822,1844-45). The WTU Constitution did permit Bullock to levy a special assessment if she sought and received

12

approval of the membership.(App. 14a   ).  Bullock chose not to.

On or about April 16,2002 Bullock contacted Baxter by phone
at his home to direct him to prepare a draft letter to the D.C.
Office of Pay and Retirement for her to authorize dues increase for
teachers and retroactive dues deduction due to the union -- as he
had similarly done over the years.(App. 32a-34a). Bullock determined
what group of teachers would get a dues increase and the amount of
such increases.-- as she had been the chief negotiator for the WTU
contract, which Baxter was never apart. Bullock instructed Baxter to
forward the draft to Herb Thomas, secretary to Bullock and Hemphill.
(App.    , ).  Baxter delivered a disc to Thomas because his
computer failed to e-mail documents. Baxter never saw final letter
until trial, which unlike prior letters, Bullock did not carbon
copy (cc:) Baxter and Hankerson.(App.32a-34a) The prosecution
referenced two letters from their expert's forensic analysis of
Baxter's computer, one with an amount of $160.09, another $16.09,
and claimed Baxter had modified the one with $16.09 after the
investigation began. However, their expert could not conclude that.

Bullock claimed the dues overcharge was not completely her
idea, but stated from the beginning she told Hemphill where to get
the money they needed.(Tr. 1844). Veleter Mazyk, General Counsel,
Public Schools, testified that when she called Bullock to clarify
instructions sent by letter, Bullock reiterated her initial request
and orally modified the letter as to how to apply the retroactive
dues deductions.(Tr.556-61). Bullock was inconsistent and
contradictory, as well as often claimed a failed memory when
testifying about her crimes.  Bullock stated she did not know what

13

amount would be in the draft letter, then later stated she already
knew the amount.(Tr 1845). Bullock also claimed she, Hemphill and
Baxter met and discussed the amount, and later Baxter calculated the
figure.(Tr. 1844-45) Hemphill, however, stated at FBI interviews
that only Bullock and Baxter discussed amount for the retroactive
dues deduction. Baxter has consistently denied meeting with Bullock
and Hemphill to discuss the amount of retroactive dues deduction.
Bullock also testified she was not sure of his presence.

A year and a half before trial, October 2003, Bullock came
before the District Court and blamed her crimes on a serious medical
condition, bipolar mental disorder, and she had been under medical
treatment since the crimes occurred.(Def.Mem. Aid of Sent. 10/23/06;
Washington Post, Jan. 2004). Bullock has attested to her Statement
of Offenses and Proffer that she and Hemphill alone knew only $16.09
should have been withheld, not $160.09 when she mailed the instruction
to the D.C. Office of Pay and Retirement.(Tr. 1732). Bullock further
stated, "as to what others did, I do not know the accuracy."(Tr.1731-
1732). Baxter is not even mentioned in the Government's own proffer
at the time of Bullock's guilty plea.(Tr. 1732). As an inducement
for substantial assistance and testify against Baxter, the prosecutors
amended the initial plea offfer to include that they would not
prosecute her for federal tax crimes. The record is not clear if the
amended plea offer also includes D.C. taxes.(Tr. 1712-1720). Bullock
was reluctant and claimed failure at memory when questioned about the
the contents and conditions of her plea deal.(Tr. 1712).

Ultimately,from teacher's complaints about the retroactive dues
charge,AFT began a forensic audit of WTU. Bullock and Hemphill

schemed with Michael Martin to manufacture fictitious invoices for Expressions Unlimited to match bogus checks Hemphill wrote.(Tr. 1631-1632). Bullock and Hemphill also instructed Holmes on how to lie to investigators.(Tr. 3720-21,3782). Bullock and Hemphill were asked to resign, and did so. Baxter was never asked to resign, nor did he. Subsequently, the AFT turned the matter over to the U.S. Attorney's Office.

## ARGUMENTS

### A.    SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the U.S. Constitution provides that in criminal prosecutions the accused shall have the right to the assistance of counsel for his or her defense. The Supreme Court has held that in order for a petitioner to show that counsel's assistance was so ineffective at the trial, sentencing, or appellate stage to warrant vacating, setting aside, or correcting a sentence by motion under 28 U.S.C. § 2255, the petitioner must meet the test established in Strickland v. Washington, 466 U.S. 668,688 (1984).

Under Strickland, Baxter must demonstrate both that counsel's performance was deficient or unreasonable under the circumstances and that the deficient performance prejudiced him such that there was "a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." U.S. v. Weaver, 234 F.3d 42, 46 (D.C. Cir. 2000)(citing Strickland, 466 U.S. at 694 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

Baxter's grounds for relief based on denial of his Sixth Amendment right to effective assistance of counsel are enumerated below:

**1.    Trial and appellate counsel failed to adequately research the facts and law, and raise issue that Baxter, as a matter of law and fact, could not be guilty of conspiracy to embezzle or defraud the Union of checks payable to him as income and pension as alleged in Indictment, and counsels failed to call a financial expert to counter Government's expert regarding common accounting practices and procedures relative to Baxter's defense to charges under counts based on 29 U.S.C. 501(c) violation.**

Under § 501(c) a violation requires the unauthorized appropriation of union property and that a defendant possessed fraudulent intent. U.S. v. Defries, 129 F.3d 1293, 1306 (D.C. CIR. 1997). Counsel failed to adequately research the record, present and argue evidence that Baxter was the **only** alleged co-conspirator to receive from Hemphill, W2 and 1099 statements that reported all checks from WTU as income and pension to the federal authorities (IRS) -- which substantiates no fraudulent intent to conspire to embezzle or steal checks for his income and pension, and that they were authorized. (App. 3a,6a   ). If counsels had reviewed the FBI 302's they would have been apprised that Hemphill attested to the FBI,IRS,DOL, and U.S. Attorney that she did not report W2 or 1099 non-payroll checks for Holmes, Bullock, or herself to IRS as legally required. (App. 35a-44a. ). Also, there was no evidence on record that Hemphill provided W2 or 1099s to other alleged co-conspirators Alderman and Martin. Counsel should have called a financial expert to counter

Government's expert regarding accounting practices and procedures
common to business to enlighten jury as to Baxter's role and
innocense in matters like W2 and 1099 filings, salary, pension, and
blank checks. Ironically, the Government designated all Baxter's
incomee as non-payroll embezzlements, including his pension payments
based on theory his services were "dishonest" therefore not due any
pay during the alleged 5 year conspiracy. Though counsel mentioned
that Baxter reported his income and paid taxes, however the most
compelling and instructive argument not made was Hemphill and
Bullock's intentional reporting to the IRS all checks to Baxter as
W2 or 1099 income, as they had done for all unindicted employees
and contractors of the WTU -- an act totally incongruous with
complicitous or conspiratorial conduct -- which represented their
view that Baxter was not a member of their conspiracy. When the
Government also argued checks payable to Baxter were not authorized,
in spite of proof his pay was mandated by WTU Constitution and
approved by Bullock, counsel failed to argue that unlike other
co-conspirators similarly charged, those checks issued to Baxter
and reported by Hemphill as W2 and 1099 income also imposed a legal
obligation, that he met, to report the same on his personal taxes
to the IRS or otherwise be subject to federal tax violations.
Moreover, unlike Bullock and Holmes, Baxter did not conceal income
and file false and fraudulent personal taxes.(Ind, Par.50) It was
a factual, if not legal impossibility for Baxter to conspire with
Hemphill and Bullock to steal and defraud WTU of his authorized
income, and at the same time agree to designate and report, at the
exclusion of all other co-conspirators, checks issued to Baxter

17

over alleged 5 year conspiracy as taxable income to IRS. Baxter was prejudiced by counsels' failure to adequately research record and ommission of such argument because these issues, if raised, stood to clearly undermine Government's theory that Baxter agreed to any overarching conspiracy. Rather, it proves Baxter's actions were consistent with a good faith belief in the legitimacy of his earned income and pension as evidenced by Hemphill's reporting the same to IRS and his state of mind, denoting honesty of purpose and freedom from intent to defraud. Moreover, because Hemphill, an adverserial co-defendant, did not testify, her only statements in the record were from interview with the FBI, IRS, DOL, and U.S. Attorney. By counsels failure to research the record, other exculpatory statements from Hemphill's interviews were excluded from the defense that Baxter had no fraudulent intent and did not conspire to embezzle such as; (1) Baxter signed blank checks in advance for her use when needed and if none were available, she and Holmes agreed to cross out vendor names and replace with his, and (2) in early 2002 Bullock wanted Baxter to sign blank checks, but Baxter did not want to and Bullock became furious and threatened to go to the Board to have him fired. As previously noted, following Baxter's altercation with Bullock, and unbeknown to Bullock and Hemphill, Baxter encrypted vouchers he reviewed and signed with attached blank checks that had no vendor or amount specified, as a reference for future audit review.

Hemphill's statements along with Bullock's testimony that they removed Baxter in 1997 as "program administrator" for WTU Amex account, then secretly removed the $5,000 spending limit imposed

by Baxter (if not removed, it could have saved WTU $1.3 million) would have been material to fraudulent intent defense. But for counsels' failure to adequately research the record and raise the above issues, a jury or court could have reasonably determined that if the President of WTU and leader of the conspiracy, who had authorized Baxter's pay, threatened to go to the Board to fire the treasurer, Baxter, for objections to signing several blank checks (with unfinished vouchers), and then, on his own initiative, he coded vouchers that had been signed with blank checks for future audit of the books, Baxter could not have been a member of their conspiracy nor have the fraudulent intent to steal or defraud the Union, thus a reasonble probability exists that the outcome of the proceeding would have been different.

2.   Trial and sentencing counsel failed to adequately research facts and law, and object to sentencing court's use of 2002 Guidelines Manual in violation of Ex Post Facto Clause of U.S. Constitution, when instead it should have used the 1997 Guideline Manual based on the date the Court determined the crime of conspiracy was committed, December 19, 1997, or the date charged in Indictment, December 1995, which provide for a lower offense level and Guidelines sentencing range.

In error the Probation Office recommended the wrong Guideline Manual, 2002, instead of 1997 for use by the sentencing court. (PSI dated 11/3/05). A sentencing court, applying the Sentencing Guidelines, must "use the Guidelines Manual in effect on the date that the defendant is sentenced" unless the court determines that this would violate the Ex Post Facto Clause of the Constitution, in

19

which case the court "shall use the Guideline Manual in effect on the date the offense of conviction was committed." U.S. Sentencing Guideline Manual § 1B1.11, U.S. v. Turner, 548 F.3d 1094,1096,1097 (D.C. Cir. 2008)(finding object of conspiracy to conceal conspiracy itself and acts in furtherance thereof do not extend conspiracy). The sentencing court followed the PSI recommendation and misapplied the 2002 edition, however the Court was explicit in stating that the date the overarching conspiracy crime was committed by Baxter was on or about December 19, 1997.(S.Tr. 12,13). The Government stipulated to this date. In the federal system, the courts of appeals relied on Miller v. Florida, 482 U.S. 423 (1987) to hold that applying post-offense Guidelines revisions would violate the Ex Post Facto Claus if the revision increased a defendants sentencing range. Turner, 548 F.3d at 1099. But for counsels' failure to object to the use of the 2002 Guidelines to calculate Baxter's sentence, in violation of the Constitution's Ex Post Facto Clause, the sentencing court would have applied the correct Guideline Manual and Baxter's sentencing range would have been 57-71 months, and it is likely that his sentence would have been less than 120 months received at sentencing. Thus, Baxter was prejudiced by counsels' deficiency.

3.     **Trial, sentencing, and appellate counsel failed to research facts and law, and object to sentencing court's miscalculation of Baxter's base offense level and violation of Ex Post Facto Clause by misapplying a 2003 amendment to a 2002 Guideline sentencing enhancement, thereby increasing his guideline range.**

The Presentence Investigation Report dated 11/3/05 indicated

that the offense involved more than 50 victims pursuant to
USSG § 2B1.1(b)(2)(B) and increased base offense 2 levels using
the 2002 edition of the Sentencing Guidelines. Without counsel
objection, the sentencing court increased the offense 6 levels for
more than 250 victims. Based on <u>Miller v. Florida</u>, 482 U.S. 423
(1987), the Court violated the Ex Post Fact Clause of the U.S.
Constitution by applying a 2003 amendment to the 2002 Guideline
base offense level. The error occurred when the sentencing court
stated the offense involved more than 250 victims pursuant to
USSG § 2B1.1(b)(2)(B), and increased the base offense level by 6
points. Pursuant to Guidelines manual Appendix C November 1, 2006,
Amendment 647, this enhancement was not to be effective until
January 25, 2003. Therefore, based on this amendment, the Court
should have used the pre-amendment point level for an offense that
involved 50 or more victims, and increased the base offense level
by 4 points under USSG § 2B1.1(b)(2)(B). As a result of counsels'
failure to identify error and object, the total offense level
should be reduced by 2 points, thereby reducing Baxter's overall
Guideline sentencing range. Under <u>Garner</u>, a retroactively applied
parole or reparole regulation, or guideline, violates the Ex Post
Facto Clause if it creates a significant risk of prolonging [an
inmates] incarceration. <u>Fletcher v. Reilly</u>, 433 F.3d 867,877
(D.C. Cir. 2006)(citing <u>Garner v. Jones</u>, 529 U.S. 244,251 (2000).

4. Sentencing counsel failed to adequately research the law and facts, and object at sentencing when the sentencing court proceeded to misapply the "Relevant Conduct" provisions of the United States Sentencing Guidelines, and use the incorrect standard to determine scope of Baxter's conspiratorial agreement and the quantity of loss attributable to him.

At the opening of sentencing, June 5, 2006, the sentencing court set out its basis and reasoning for making its determinations. In sum, the Court stated that pursuant to F.R.C.Procedure Rule 32 it would review those factual disputes that Baxter raised with regard to the Presentence Report that are material to the calculation of the Sentencing Guideline range and issue its resolution as to them so that the parties would have the Court's ruling on what the appropriate Guideline range was in this case.(S.Tr. 5-7). In its analysis the Court proceeded to juxtapose the arguments of the Government with Baxters regarding listed material issues in dispute and simply resolve them by assigning guidline points to Baxter's offense level. By example, the Court stated, "With respect to the loss calculation attributable to defendant Baxter, counsel for Baxter contends that the loss attributable is less than a million dollars. The Government contends that the loss attributable to defendant Baxter is over $2.5 million and, therefore, 18 points should be added to his total offense level."(S.Tr. 15). Following such determinations, the Court provided a breakdown of the total loss, $4,249,000, and attributed the total to Baxter. Counsel did not object. The Court never, however, set out the legal standard to determine the scope of Baxter's agreement to participate in the

22

conspiracy as required by the United States Sentencing Guidelines
§ 1B1.3(a)(1)(B). On the contrary, the Court was emphatic in stating
that it need not, therefore, would not make findings as to when
Baxter joined into a conspiracy to commit each of the objectives of
the conspiracy because it found there was one overarching conspiracy
which Baxter joined. Counsel failed to object and advise the Court
that under the Guidelines to determine relevant conduct, and hold a
defendant accountable for the acts of others, a district court must
make two [particularized] findings: (1) that the acts were within
the scope of the defendant's agreement and (2) that they were
foreseeable to the defendant. USSG § 1B1.3 Applic.Note 2. Nonetheless,
the Court's analysis on scope of agreement was limited to the date
Baxter joined the conspiracy. In further contravention to the required
legal standard, in the case of jointly undertaken criminal activity,
the Court addressed foreseeability prong by simply determining that
"all actions of the co-conspirators were reasonably foreseeable
over a five year period form the date Baxter joined conspiracy by
cosigning a check to Leroy Holmes December 19, 1997. [Even] Pinkerton
did not create "a broad principle of vicarious liability that
imposes criminal responsibility upon every co-conspirator for
whatever substantive offense any of their confederates commit."
U.S. v. Bruno, 383 F.3d 65,90 (2nd Cir. 2004). Baxter was prejudiced
by counsel failure to argue the Guidelines prescribe that in a
"jointly undertaken criminal activity," whether of not charged as a
conspiracy, to determine the defendant's accountabliity for the
conduct of others, the court must first determine the scope of the
criminal activity the particular defendant agreed to jointly

23

undertake (i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement). USSG § 1B1.3(a)(1)(B) and Applic. n.2. But for counsel's failure to object, as stated above, the Court could have proceeded with the proper legal standard, thus not violating Baxter's 5th Amendment due process rights, rendering the proceeding unfair and the outcome unreliable.

**5.  Trial counsel failed to investigate and obtain medical records of Government's chief witness, Barbara Bullock, and use for impeachment purposes and attack credibility, and failed to consult or call a medical expert as a witness regarding Bullock's mental illness, bipolar disorder ,and medical treatment.**

Bullock pleaded guilty October 2003 and was sentenced on January 30, 2004. Bullock was the only co-conspirator -- indicted or unindicted -- to attest that Baxter participated in any scheme to steal or defraud the WTU. Due to her substantial assistance she received a 2 1/2 year sentence reduction to serve 5 years 2 months in prison. The prosecutor, Anthony Alexis, described her testimony as "powerful." See Theola Labbe, <u>Bullock Gets 2 1/2 Year Sentence Reduction</u>, Washington Post, January 24, 2007. At Bullock's initial sentencing she blamed her crimes on bipolar disorder. Counsel failed to research the record, indicating that she suffers from bipolar disorder and receives medications to control her condition. (Def.Mem. in Aid of Sent. on Remand p.6). At trial Bullock's failures at memory, inconsistent and contradictory statements, mood changes and behavior raised questions about her mental, emotional and psychological fitness to provide honest and reliable testimony. Her disposition was even rebuked by the Government

24

when they asked, "If you could just pay attention ... try to speak
into the microphone." (Tr.1258). Regarding inconsistent and
contradictory statements, Bullock agreed on October 7, 2003 with her
Statement of Offenses and Proffer that she and her executive assistant,
Hemphill, fraudulently instructed the D.C. Office of Pay and
Retirement to withhold an unlawful amount from teacher's dues checks,
but at trial gave a vacillating account of Baxter assisting in her
scheme. Counsel's failure to investigate Bullock's medical condition
and records waived Baxter's opportunities to impeach and attack
crdibility. See Tucker v. Prelesnick, 181 F.3rd 747,756 (6th Cir.1999)
(found that attorney failure to obtain medical records casting
serious doubt on the reliability of the prosecution sole witness
and failure to obtain and use contradictory statements of the witness
was so serious as to deprive defendant of a fair trial guaranteed
by the Sixth Amendment). Because Bullock's medical problems were
already of record, Baxter raised the issue to counsel and requested
its use, yet counsel failed to even consider consulting a medical
expert. The National Institute of Mental Health states that bipolar
disorder is a long-term illnesss that must be carefully managed
throughout a person's life and symptoms are severe, whch include
having problems concentrating,remembering and making decisions.
(App.45a-47a). The Supreme Court held, counsel's failure to uncover
and present extensive mitigating evidence could not be justified on
a decision to focus on other defense because that decision was
made prematurely, without the benefit of a thorough investigation.
William v. Taylor, 529 U.S. 362,390 (2000). Counsel's failure to even
investigate the scientific implications of Bipolar Disorder or

consider consulting a medical expert regarding the reliability of Bullock's memory is constitutionally ineffective under <u>Strickland</u>. <u>See Bell v. Miller</u>, 500 F.3d 149,156-157 (2nd Cir. 2007). But for counsel's unprofessional errors, there is a reasonable probability the outcome of the proceedings would have been different.

**6.      Trial counsel failed to investigate and prepare for trial by not interviewing any witnesses provided by Baxter or the 45 from the Government's list.**

From initial meeting December 23, 2003, Baxter discussed with counsel critical witnesses for his defense and recommended that they be interviewed to prepare for trial. In addition, Baxter requested that counsel subpoena documents from the D.C. Office of Pay and Retirement and the Washington Teachers' Union that he did not find, that he was aware of, among discovery documents. (App. 49a-51a ). Baxter read all  interview statements  provided by the Government and its witness list, and pointed out witnesses favorable to his defense, as well as close WTU board members, personal friends and family members, WTU office staff, D.C. Councilmembers, mayors, city administrators, union presidents, professional colleagues, a D.C. Control Board member, and other associates.(App. 51a,52a). Before trial, Baxter had been a resident of Washington, D.C. for 50 years with a diverse breadth of personal and professional relationships -- counsel failed to interview or prepare any witness provided by Baxter. By example, one potential witness, Herb Thomas, Secretary and Assistant to Bullock and Hemphill, communicated with Bullock upon receipt of the controversial "draft" retroactive dues letter from Baxter and finalized it for her signature, communicated

with all board members, typed all minutes for the Executive Board meetings and prepared, typed, and handled all correspondence on their behalf, and was privy to their inter-office conversations. Thomas alone represented a key witness to impeach Bullock, and pivotal opportunity to dismantle Government's case. Instead, counsel, without consulting Baxter, chose to call but one witness, outside of a firm staff member who introduced exhibits prepared by Baxter related to his pension payments, "Myong Lim," Bullock's dress maker, who counsel herself considered problematic.

Had trial counsel interviewed the witnesses, her decision not to call them might have been protected from ineffective assistance claim as a tactical decision. Counsel's decision to call <u>no</u> witness offered by Baxter and complete failure to investigate potentially corroberating witnesses, however, can hardly be considered a tactical decision. As the Supreme Court noted in <u>Strickland</u>, "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>United States v. Debango</u>, 780 F.2d 81,85 (D.C. Cir. 1986)(citing <u>Strickland</u>, 104 S. Ct. at 2006); <u>Wiggins v. Smith</u>, 123 S.Ct. 2527, 2535 (2003). Trial counsel's failure to investigate under these circumstances rises to the level of a constitutionally deficient performance. But for trial counsel's failure to investigate and interview numerous available and corroberating witnesses, there is a reasonable probability that the outcome of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694.

7.    Trial counsel failed to raise claim before trial as required
by Federal Rules of Criminal Procedure Rule 12(b)(3) that the
Indictment under Count 1 Conspiracy charge, "Deprivation of Honest
Services" fraud was legally flawed, therefore the appellate court
denied its review.

On February 8, 2008 the appellate panel denied review of
Baxter's argument that his conviction under Count 1 Conspiracy, was
based on a legally impermissible charge, "Deprivation of Honest
Services," because trial counsel  failed to raise claim before trial,
so it constituted a waiver under 12(b)(3). Baxter petitioned the
panel for a rehearing en banc and the Supreme Court stating; (1) he
has a right to appellate review of the legal sufficiency of the
verdict; (2) the panel was required to examine the legal sufficiency
of each basis of liability to ensure the jury did not convict on a
legally impermissible ground; and (3) the statute, as charged in
the Indictment, was sufficiently vague as to not avail him a defense
until he had heard all of  the Government's proof relating to
deprivation of honest services. Under Count 1, Conspiracy, the
Indictment alleged four object offenses, including wire and mail
fraud in violation of §§ 1341 and 1343 (the "money or property"
charges), and § 1346 "Deprivation of Honest Services" charge. In
regard to "dishonest services," the Indictment alleged a scheme or
artifice to deprive WTU and its members of their intangible right
to the honest services of defendants, performed free from deceit,
dishonesty, self-enrichment, and self-dealing. The Indictment stated
the purpose of the conspiracy was to enrich defendants by stealing
millions from WTU. Also, the Indictment had an omnibus listing of

eleven (11) activities under the "Manner and Means of the Conspiracy" to support the charge. In sum, the tenth activity alleged Goosby, Bullock, and Holmes failed to report non-payroll checks from WTU for Bullock and Holmes, and they filed false and fraudulent personal federal taxes. The tax fraud scheme was also alleged under the "Manner and Means of the Scheme" for the substantive wire fraud, mail fraud and deprivation of "honest services" offense. Holmes testified extensively to the crimes of defrauding the IRS.

The Government must prove each theory of criminal liability in order for the conviction for the Conspiracy count in the indictment to be affirmed. <u>Yates v United States</u>, 354 U.S. 298 (1957). The jury was not asked to indicate which object offense they had unanimously found beyond a reasonble doubt Baxter had committed. Thus Baxter argued, the appellate panel was required to examine the legal sufficiency of each basis of liabiity to ensure that the jury verdict did not convict on a legally impermissible ground. <u>See Griffin v United States</u>, 502 U.S. 46,59 (1991). Baxter argued the "Deprivation of Honest Services" charge was legally flawed. Although § 1346 defines "scheme or artifice to defraud" it offers no definition of "honest services." <u>U.S. v. Skilling</u>, 554 F.3d 529,543 (5th Cir.2009). Baxter has argued that he did perform his duties free from deceit, dishonesty, self-enrichment, and self-dealing. The record evinces that he performed his duties with the direction and authorization of his superiors, and did not act of personal gain,but rather in the interest of the Union, and received only income and benefits he was entitled to based on the policies of the WTU.

The trial court, in its jury instructions, principally determined that a violation of one's fiduciary duty to provide honest services to one's employer constitutes "honest services" fraud under the statute.(Tr. 7069, 7070). However, not every breach of fiduciary duty owed by an employee to an employer constitutes an illegal fraud. <u>United States v. Rybicki</u>, 354 F.3d 124,145 (2nd Cir. 2003). Breaches of fiduciary duty are criminally fraudulent only when "accompanied by misrepresentation or nondisclosure that is intended or is contemplated to deprive the person to whom the duty is owed of some legally significant benefit. <u>United States v. Lemire</u>, 720 F.2d 1327, 1335 (D.C. Cir. 1983) Specifically, the tenth activity alleged by the Government -- the tax fraud scheme -- would not have supported a conviction for a breach of fiduciary duty owed to the Union or its members. Bullock and Holmes concealment of income from tax filings defrauded the IRS, not the WTU, for whom they owed no duty as an employee. This activity could not, as a matter of law, deprive the WTU of its money, property interest, or right to honest services. <u>See United States v. Defries</u>, 129 F.3d 1293,1304-06 (D.C. Cir. 1997). Because the jury could have convicted Baxter on the basis of Bullock and Holmes' scheme to defraud the IRS, and not the Union, the conviction was impermissible and should be dismissed. <u>United States v. Brown</u>, 459 F.3d 509 (5th Cir. 2006). The charges indicting Baxter for wire fraud and mail fraud were legally insufficient. Because of the general verdict, the conviction under Count 1 must be reversed. <u>Yates</u>, 354 U.S. at 312. Further in light of the Court's "Pinkerton" instruction in Count 1, over defense

objections, Baxter's conviction of the substantive counts in the
Indictment must be dismissed. United States v. Brown, 459 F.3d 509,
523 (5th Cir. 2006). Because of trial counsels deficient performance
Baxter's argument above has never been heard, thus denying him his
just 5th and 6th Amendment rights. But for counsel's failure, there
is a reasonable probability the outcome of the proceedings would
have been different. Moreover, there are facts and issues that
could have been discerned that, in light of the Supreme Court
hearing three cases this term regarding "honest services fraud,"
would have been preserved on appeal. Therefore, if needed, Baxter
wants to preserve for future argument, issues related to this case
based on the findings of the Court this term in United States v.
Black, No. 08-876; United States v. Weyhrauch, No. 08-1196; and,
Skilling v. United States, No. 08-1394.

8.    Appellate counsel failed to raise issue that the Government
constructively amended indictment on Count 1, Conspiracy, under
18 U.S.C. § 371 and substantive counts, by proof at trial that
broadend the basis of conviction from that which appeared in the
indictment.

        The Government charged Baxter in Count 1 under 18 U.S.C.
§ 371 with "Conspiracy to commit offenses against the United States"
provision of the statute, but used trial evidence for another theory
of prosecution, the "Conspiracy to defraud the United States"
provision of the statute, not contained in the indictment to convict
Baxter. Under Count 1 the Government alleged a conspiracy to violate
four object offenses, including wire and mail fraud, and deprivation
of honest services. The indictment stated the object of the

31

conspiracy was to defraud and steal from the WTU. In sum, the tenth
activity under the "Manner and Means of the Conspiracy" to support
the alleged scheme to defraud the WTU stated that Goosby, Bullock,
and Holmes failed to report income known to be embezzled when they
filed false and fraudulent personal tax returns. See Indictment.
The tax fraud scheme was also alleged as the "Manner and Means of
the Schemes" in the substantive wire and mail fraud offenses, and
was referred to in the jury instructions. As a key Government
witness, the Circuit Court found Holmes impeachment most damaged
by his perjury and lies associated with evidence falsifying his
personal tax returns. Counsel failed to notice there were no
charges in the superseding indictment to defraud the IRS of personal
income taxes, and the link to Holmes extensive testimony that was
used alternately by the Government to support its charge of
Deprivation of Honest Services" fraud against the WTU. The target
of that scheme was to defraud the IRS, not the WTU.

Baxter was prejudiced by counsel not being able to recognize
and argue the changing and broadening of the Government's theory
at trial, which allowed them to prosecute Baxter using the "defraud"
provision of 18 U.S.C. § 371, Conspiracy, as an implicit part of the
" to commit offenses" provision of § 371, when it was required by
law to explicitly, and seperately, allege the "to defraud" provision
in Count 1. United States v. Minarick, 875 F.2d 1186 (6th Cir. 1989);
United States v. Haga, 821 F.2d 1036,1043 (5th Cir. 1987)(held proof
of conspiracy to defraud the United States constitutes a total
variance when the indictment had charged the defendant with conspiracy
to commit offenses against the United States). Counsel failed to

argue that, when the trial evidence or jury charge operates to " broaden the possible bases for conviction from that which appeared in the indictment," the indictment has been constructively amended. United States v. Miller, 471 U.S. 130,138 (1985). The Supreme Court stated, " Our rule that a constructive amendment is per se prejudicial is grounded in the recognition that [t]he very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a grand jury of his fellow citizens acting independently of either prosecuting attorney or judge." Stirone v. United States, 361 U.S. 212 (1960). As decided in Stirone and its progeny, the conviction should not stand.

Council's deficient performance prejudiced Baxter by effectively denying him his 5th and 6th Amendment rights. This standard requires counsel "to research relevant facts and law, or make an informed decision that certain avenues will not be fruitful. Strickland, 466 U.S. at 668,687. This requirement was not met, as this ground represents a meritorious claim for fundamental constitutional rights.

**9.    Appellate counsel failed to raise issue that Count 1 failed to charge all essential elements of conspiracy offense under 18 U.S.C. § 371 and move for dismissal of conviction.**

The Government indictment in Count 1 charged Baxter under 18 U.S.C. § 371 with "Conspiracy to commit offenses against the United States." Section 371 provides criminal penalties for two distinct types of conspiracies, conspiracies "to commit any offense against the United States," and conspiracies "to defraud the United States or any agency thereof." U.S. v Falcone, 934 F.2d 1528 (11th Cir. 1991).  The Indictment stated:

> It was the purpose of the conspiracy for the defendants
> to enrich themselves and others known to the Grand Jury
> by stealing millions of dollars from WTU and its
> individual members, and to hide and cover up the conspiracy,
> its object, and the actions in furtherance of it.

The tenth activity alleged by the Governmeent as part of the "Manner and Means of the Conspiracy" stated that Bullock and Holmes concealed conspiracy by failing to designate as income WTU checks they knew were written outside the WTU payroll in filing false and fraudulent personal tax returns. At trial Holmes testified extensively to prove the scheme to fraudulently report taxable income to IRS in support of Government's theory of one overarching conspiracy to convict Baxter. However, counsel failed to identify and argue that the Conspiracy, Count 1, did not include the "to defraud the United States" provision, an essential element, as required under 18 U.S.C. § 371; or specifically charge an offense to underreport or evade personal taxes as offenses against the United States in order to prosecute and convict Baxter under a conspiratorial scheme to defraud the United States or the IRS. Conspiracies criminalized under § 371 are defined by the target of the conspiracy, and the conspiracy to defraud the IRS ·was a scheme to steal from the IRS, not the WTU, and must be specifically alleged under the conspiracy statute to independent targets. United States v. Minarick, 875 F.2d 1186,1193-94 (6th Cir. 1989); Tanner v. United States, 483 U.S. 107, 130-31 (1987). Thus, Baxter was prejudiced by counsel's failure to argue that when the trial court admitted testimony and other evidence to the crime of defrauding the IRS, without it being charged in the indictment under Count 1, it permitted Baxter's conviction on a charge not fully contained in the indictment. This kind of ommission

by counsel was critical to the protection of Baxter's 5th Amendment rights. <u>Russell v. United States</u>, 369 U.S. 749,763-64 (1962).

Appellate counsel's failure to research the relevant facts and law and raise this issue fell below an objective standard of reasonableness. But for such unprofessional error the outcome of the proceeding would have been different, as failure to charge all essential elements of the offense would have warranted dismissal of the charges.

**10.  Trial counsel failed to conduct adequate pretrial investigation and call a computer expert to counter Government's expert, and failed to call handwriting expert to authenticate forgeries of Baxter's signature.**

Central to the prosecution's case to convict Baxter was a draft of a letter retrieved from his computer that had been prepared by him at the direction and with instruction from Bullock. The draft authorized the D.C. Office of Pay and Retirement to deduct $160.09 in retroactive dues from teachers when it should have been $16.09. Government's computer expert retrieved two draft letters from the computer, one with $160.09, and another $16.09. Government's expert claimed that a year before trial they could not determine inculpatory evidence, as noted in their investigation report, but by trial their training allowed them to look at metadata and draw conclusions about dates of preparation and modification. Prosecutor's used their expert's testimony to attack Baxter's character for honesty, credibility, and complicity in Bullock's scheme to overcharge teachers. However, before trial and after Government had analyzed computer, Baxter picked it up and dropped it off on July 9, 2004 for analysis

by a specialist from counsel's law firm.(App.53-54a ). Later a
meeting was held with Attiba Ellis, assistant to counsel, the firm's
specialist and Baxter to discuss findings, which the firm's
specialist said were exculpatory. At trial, July 2005, upon hearing
Government's expert, Baxter requested counsel to use the firm's
specialist or get a forensic expert to counter governments testimony
about modification to document. Counsel could not grasp the technical
issues and shortcomings of the Government's testimony -- as she had
not been present at the meeting with the firm's specialist -- and
decidedly called neither the specialist or expert for Baxter's
defense. Ignoring such evidence under the circumstances of this
case simply cannot be characterized as the reasonable exercise of
professional judgment. Soffar v. Dretke, 368 F.3d 441,478(5th Cir.2004)
(citing Strickland,466 U.S. at 691).

    Embezzled checks were a core part of schemes to defraud WTU.
Bullock testified to forging Hankerson's signature and using Baxter's
American Express card without his knowledge or consent. In addition,
Holmes testified to Hemphill's forgery of Baxter's signature on
altered checks. Michael Martin and Bullock were used by prosecution
to authenticate Baxter's signature (Tr.2430-38,1352-53). Although
obliged to sign checks as treasurer, the sentencing court and
appellate court attributed the entire embezzlement on Baxter co-
signing checks.(S.Tr. 12-15). With defense's handwriting expert
counsel could have unveiled a number of forgeries and rehabilated
any loss of Baxter's character and credibility associated with Bullock
and Hemphill's check writing scheme and mitigated appearance of
motive, intent and complicity. See Pavel v. Hollins, 201 F.3d 210,

219 (2nd Cir. 2001)(finding ineffectiveness for failure to call witness whose testimony could bolster defense theory). But for counsel's failure to adequately prepare for trial and call experts to identify forgeries and counter Government's attack on Baxter's defense and enlighten the jury to his lack of motive, intent and complicity, the outcome of the proceeding would have been different.

**11.     Appellate counsel failed to raise issue of intervening change in the law of the Circuit while case was still under advisement regarding what constitutes "concealment" element of money laundering charge, 18 U.S.C. § 1956(a)(1)(B)(i) that Baxter was convicted under.**

Baxter challenged his conviction for money laundering under 18 U.S.C. 1956 (a)(1)(B)(i), along with conspiracy to money launder on appeal and at oral hearing November 15, 2007. The Court's decision February 8, 2008 affirmed conviction. In the interim there was an intervening change in the Circuit's law: United States v. Adefehinti, 510 F.3d 319 (D.C. Cir. 2007), argued October 12, 2007, was decided December 18, 2007. This decision overturned a conviction under 18 U.S.C. § 1956 (a)(1)(B)(i) on the ground that the alleged money laundering transactions represented an insufficient basis for a reasonable jury to conclude that they were apart of a scheme to conceal the fact that the funds were the proceeds of fraudulently obtained bank loans. Id. at 324. The panel's decision in Adefehinti directly supported Baxter's argument against the transactions the Government charged constituted concealment under the statute. Before Adefehinti was decided, and over Government objection, sentencing Judge Richard J. Leon correctly stated that the money laundering in Baxter's case was not sophisticated, sufficiently detailed, or

37

complex to warrant a two point increase. (S.Tr.) The charged

transactions do not prove the fourth element of the offense, that

they were "attempts to disguise the embezzeled funds" as defined in

Adefehinti. While Baxter's case was still on appeal under advisement,

counsel should have been on the lookout for significant new authority

that would have buttressed Baxter's argument had it existed earlier.

While it is not required  for counsel to forsee changes in law,

once a change -- particularly an important and relevant change --

does come about, we do expect counsel to be aware of it. See

Johnson v. United States, 520 U.S. 461,468 (1997). As such, Baxter

was fully entitled to the benefit of legal arguments relying on this

opinion. See Teague v. Lane, 489 U.S. 288,310 (1989)(finding that

the defendant could raise a claim on appeal that relied on a holding

established after the trial's conclusion but before the appellate

process had been exhausted).  Over 52 days elapsed between the

Adefehinti final  decision and Baxter's. The Federal Rules of

Criminal Procedure,Rule 28(j), states in sum that if pertinent and

significant authorities come to a party's attention after the party's

brief has been filed, or after oral argument but before decision,

a party may promptly advise the circuit clerk by letter. Baxter

was prejudiced by counsel's failure to supplement his brief and

oral argument with a Rule 28(j) letter. But for counsel's deficient

performance, there is a reasonable probability that the result on

appeal would have been different. Strickland, 466 U.S. at 694.

12.    Trial and appellate counsel failed to object and raise issue
that jury instruction for embezzlement charge was improper because
it did not instruct jury of Government's burden to prove that Baxter
lacked good faith belief that an expenditure was for the legitimate
benefit of the Union.

There are two types of offenses under § 501(c): those involving
authorized use of funds and those with unauthorized use. The elements
of each differ. <u>United States v Dixon</u>, 609 F2d 827,829 (5th Cir. 1980).
In the instant case there was authorized use and unauthorized use of
funds. In unauthorized use cases the Government need only prove
lack of proper authorization and fraudulent intent, however where
authorized use is involved the Government must also prove that the
defendant "lacked a good faith belief that the expenditure was for
legitimate benefit of the union." Id. Counsel failed to raise issue
that trial court did not fully articulate Government's burden, but
instead left it optional for the jury to deliberate Baxter's " good
faith belief" without considering whether the Government had first
met its own burden to prove he lacked such belief. When trial court
instructed the jury that they **"may"** consider a good faith belief
defense, it was "per se" an instruction that the defense is not
relevant, nor required, for deliberating guilt.(Tr. 7106). Moreover,
counsel's failure to  object and raise issue of ommision of
Government's burden prejudiced Baxter by suggestion to jury of its
irrelevence to the question of fraudulent intent and muted Baxter's
main defense from the onset of opening statement -- Baxter's good
faith belief and reliance on financial professionals without intent
to defraud. Fraudulent intent requires actual knowledge that the

use was unauthorized. U.S. v. Hammond, 201 F.3d 346,349 (5th Cir.1999). Thus a good faith belief in union benefit constitutes a defense unless the Government can show that the defendant knew that the funds were unauthorized. Dixon, 609 F.2d at 829. But for counsel's unprofessional error, there is a reasonable probability the Court would have found that the jury instructions did not reflect the proper standard and reversed judgment in fairness to the proceeding.

**B. VIOLATION OF FEDERAL LAW AND OTHER COLLATERAL ATTACK**

**1. Prosecution failed to disclose "Brady" information concerning the medical and mental condition of their chief witness, Barbara Bullock, that was material to impeachment, in violation of Baxter's 5th Amendment rights.**

Bullock entered her plea of guilty October 7, 2003. In exchange for substantial assistance the Government offered a downward departure and later amended offer to include agreement not to prosecute her for federal tax crimes. At the January 30, 2004 sentencing hearing Bullock blamed her crimes on Bipolar Disorder and the Government was apprised of the severity of her condition and need for medication to control it. On January 23, 2007 Bullock was awarded a 2 1/2 year sentence reduction for substantial assistance she provided to convict Baxter.

Although the prosecution knew of Bullocks medical condition and mental infirmities associated with bipolar disorder, and had access to her medical records before, and during incarceration before trial, they provided no information to the defense. A serious symptom of the disease is inability to concentrate and loss of memory. (App. 46a ). The prosecution has an affirmative duty to

disclose material evidence favorable to a criminal defendant.
U.S. v. Smith, 77 F.3d 511 (D.C. Cir. 1996)(citing Brady v. Maryland,
377 U.S. 83,87 (1963) ). Mental records can be material as
impeachment evidence because they can cast doubt on the accuracy of
a witness testimony. Id at 516. This Circuit has agreed that evidence
regarding mental illness is relevant when it may reasonably cast
doubt on the ability or willingness of a witness to tell the truth.
Id. With full disclosure defense counsel could have pursued
overpowering cross-examination, challenging the veracity of Bullock's
statements, as well as failures to recall exculpatory facts. The
import of such cross-exmination is sufficient to undermine confidence
in the jury's verdict, thereby satisfying the threshold for
materiality laid out by Kyles. Smith, 77 F.3d at 516 (citing
Kyles v. Whiting, 115 S.Ct. 1555-56 (1995).

Because the Government's nondisclosures significantly impaired
defense counsel's ability to impeach the credibility of their chief
witness, Bullock, in violation of Baxter's 5th Amendment rights,
Baxter asks that the sentence be vacated.

## CONCLUSION

I exercised my constitutional right to a jury trial because I was not guilty of the charges as alleged by the United States Attorney in the Indictment. However, I am humbled before the Court and recognize in hindsight that maybe I could have made better judgments as WTU's treasurer, but this Court is fully aware, and the facts demonstrated, that I did not agree to pillage the WTU, as Bullock and Hemphill conspired with others to do.

I tried to put safeguards in place, which if Bullock and Hemphill would have adhered to, the WTU would have never been in arrears with the AFT, rather they would have enjoyed a million dollar plus surplus. The tasks as Treasure for WTU did not fit the job description, and with my many years of professional experience in organizations before WTU, the lack of authority in the position should have been my first cue. Yes, I did plenty of honest work that today still benefits members of the Union, least of which ever involved the position of Treasurer, but rather as Legislative Representative. I was elected Treasurer of WTU and not the police of WTU. I took responsibility for the duties assigned to me and for my own conduct as a staff employee, however there was a broader responsibility to the members, and if the authority I was provided did not allow me to meet it, I should have shown myself to the door.

I had been a productive and civic-minded person, and asset to my community for over 50 years of my life, without any criminal history. I literally had to pull myself up, with support of a God centered family, from the trappings of poverty and crime in Washington D.C. to attend some of the best schools in the country

and worked for some of the top fortune 500 companies. I came to WTU to add value and grow the organization, not to bankrupt its coffers or besmirch its name. I acted in good faith and fulfilled my duty as Treasurer as best able under the circumstances. Yet today I stand 41 months as an imprisoned man. Sentenced harshly, and held responsible for all the monetary loss of Bullock and Hemphill's schemes and lavish adventures. Whereas I reported to the IRS all income I received from the WTU, I am being penalized for the millions in unreported income of Bullock, Hemphill and their confederates. The U.S. Attorneys proved they can will a jury to their ends and get a conviction, even if it is manifestly wrong. This is not in the interest of justice, or upholding the public reputation of the judiciary.

Your Honor, in your reasoned judgment, it is requested that you find from the facts and grounds presented in this proceeding Baxter's term of imprisonment is unreasonably punitive and greater than necessary. Thus, based on the foregoing arguments and authorities, and the record in this case, this Honorable Court is respectfully urged to issue a writ of habeus corpus to have Baxter brought before it to the end that he may be relieved of his unconstitutional sentence and conviction by Court's power to vacate both, or grant such other relief as the Court deems appropriate.

Dated _January 10, 2010_

Respectfully Submitted,

James O. Baxter, II, Pro Se

43

## CERTIFICATE OF SERVICE

I, James Odell Baxter, II, certify under penalty of perjury that on January _//_, 2010 I have served the § 2255 Motion and Memorandum of Law, Motion For Hearing, Motin For Discovery, Motion For Expansion of Record, and Motion For AD Testificandum on The Office of the Clerk For The United States District Court For The District of Columbia, E. Barret Prettyman United States Courthouse, 333 Constitution Avenue, N.W. Washington, D.C. 20001, and a copy of each document aforementioned, by depositing in the institution's internal mail system an envelope containing the above documents with first class mail, postage prepaid.

James O Baxter

James Odell Baxter, II, Pro Se
FCC Petersburg
P.O. Box 1000
Petersburg, Virginia 23804

```
                              IN THE
                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


James Odell Baxter, II            :
          Petitioner,

v.                                :     **MOTION FOR HEARING**

United States Of America          :     Case No. _____
          Respondents,

_____
```

Now comes the Petitioner, James Odell Baxter, respectfully petitioning the Court

for Hearing, pursuant to Rule 8, of the Rules Governing §2255 Motions.

In particular, the Supreme Court in <u>Townsend v. Sain</u>, 372 US 293(1963), "held that

the federal judiciary must resolve any factual dispute material to a claim

appropriately raised by a habeas corpus petition and that resolution of factual

disputes requires an evidentiary hearing in most cases."

This holding is also in line with <u>Machibroda v. United States</u>, 368 US 487(1962).

Petitioner has made a substantial showing that a hearing must be held by:

(1) alleging facts, that if proved, entitle the petitioner to relief; (2) by alleging

facts that are not frivolous or false; and (3) by alleging facts that were beyond the

control of the petitioner.


Date: *1/11/2010*                        Respectfully submitted,

                                         *James Odell Baxter*
                                         James Odell Baxter, II   Pro-se

IN THE
                      UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


James Odell Baxter, II                    :
           Petitioner,

v.                                        :      **MOTION FOR EXPANSION OF RECORD**

United States Of America                  :      Case NO. _____
           Respondents,

_____

     Now comes the Petitioner, James Odell Baxter, respectfully petitioning the

Court for Motion For Expansion Of Record, pursuant to Rule 7 of the Rules Governing

§2255 Motions.

In particular, the Supreme Court in Machibroda v. United States, 368 US 487(1962),

made clear letters, exhibits, reports, affidavits, and other materials relevant to

the habeas proceedings should be included in the record, pursuant to Rule 7.

In the case at bar, the Petitioner has made very relevant grounds requiring relief,

and those specific grounds are supported by materials that need to be included in

the record.


Date: _1/_11/_2010___                              Respectfully submitted,

                                                   James Odell Baxter,  Pro-se

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


James Odell Baxter, II                    :
          Petitioner,

                                          :

v.                                        :     **MOTION FOR AD TESTIFICANDUM**

United States Of America                  :     Case No. _____
          Respondent,

_____

     Now comes the Petitioner, James Odell Baxter, respectfully petitioning the Court

for Motion For Ad Testificandum, in reference to the §2255 Motion, that the Petitioner

has submitted.

The Petitioner has addressed material grounds and facts, that requires testimony

from his prior attorney's ( Michele A. Roberts, Elmer D. Ellis, and Lisa A. Jones).

The Petitioner respectfully Motions for Leave to have these attorneys subpoena by

the Honorable District Court, to further demonstrate the grounds raised by the

Petitioner.



Date: 1/ 11/ 2010                              Respectfully submitted,


                                               _James O Baxter_____
                                               James Odell Baxter, II  Pro-se

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


James Odell Baxter, II            :
        Petitioner,

                                  :

v.                                        **MOTION FOR DISCOVERY**

                                  :

United States Of America              Case No. _____
        Respondent,               :
_____

    Now comes the Petitioner, James Odell Baxter, respectfully petitioning the

Court for Motion of Discovery , pursuant to Rule 6 of the Rules Governing §2255

Motions.

In particular, the Advisory Committee Note reaffirms the District Court's duty under

Harris v. Nelson, 394 US 286(1969), to order discovery when a petitioner's specific

allegations suggest that full development of the facts may enable him to demonstrate

a right to relief.

Herrera v. Collins, 506 US 390(1993), standing on the Harris decision, went further

to state; "a court's denial of discovery is an abuse of discretion if discovery is

indispensable to a fair, rounded development of the material facts."


Date: _1/11/2010_                         Respectfully submitted,


                                          _James O Baxter_
                                          James Odell Baxter, Pro-se