IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America                                    : Criminal No. 03-516-01

                                                                    (Civil No. 1:10-cv-59)

                        v.                                        :


James Odell Baxter, II,

                                                                    :

                        Petitioner/Movant

**SUPPLEMENTAL MOTION TO VACATE, SET ASIDE OR
CORRECT SENTENCE PURSUANT TO 28 U.S.C. 2255**

        Petitioner, by and through his attorney, submits the following as a supplement to the pro-

se 2255 motion.

## I. STATEMENT OF THE CASE

        On November 20, 2003, a Grand Jury in the District of Columbia returned a twenty-three

count indictment against James Odell Baxter, II, James A. Goosby, Jr., and Gwendolyn M.

Hemphill.

        Count One charged all defendants with conspiracy to commit offenses against the United

States in violation of 18 U.S.C. 371 and 18 U.S.C. 2.

        Count Two charged all defendants with wire fraud and deprivation of honest services and

aiding and abetting in violation of 18 U.S.C. 1343, 1346 and 18 U.S.C. 2.

        Counts Three through Five charged all defendants with mail fraud, deprivation of honest

services, and aiding and abetting in violation of 18 U.S.C. 1341, 1346 and 2.

        Count Six charged Baxter and Hemphill with false statements and aiding and abetting in

violation of 18 U.S.C. 1001 and 2.

Count Seven charged Baxter, Goosby and Hemphill with false statements, and aiding and abetting in violation of 18 U.S.C. 1001 and 2.

Counts Eight through Thirteen charged Baxter and Hemphill with embezzlement from a labor union and aiding and abetting in violation of 29 U.S.C. 501(c).

Count Fourteen charged Baxter and Hemphill with conspiracy to commit money laundering in violation of 18 U.S.C. 1956(h).

Counts Fifteen through Nineteen charged Baxter and Hemphill with money laundering in violation of 18 U.S.C. 1956(a)(1)(B)(i) and 2.

Count Twenty charged Baxter and Hemphill with making a false record and aiding and abetting in violation of 29 U.S.C. 439(c) and 18 U.S.C. 2.

Count Twenty-One charged Baxter, Goosby, and Hemphill with making a false record and aiding and abetting in violation of 29 U.S.C. 439(c) and 18 U.S.C. 2.

Count Twenty-Two charged Baxter and Hemphill with first degree theft in violation of DC Code 22-3211 and 22-3212(a).

Count Twenty-Three charged Baxter, Goosby and Hemphill with causing the filing of a false tax return and aiding and abetting in violation of 26 U.S.C. 7206(2) and 18 U.S.C. 2.

The criminal conduct set forth in the indictment occurred between November 1995 and October 2002.

On August 31, 2005, Baxter and Hemphill were convicted on all counts following a jury trial before the Honorable Richard J. Leon. Goosby was acquitted on all counts.

On June 5, 2006, Baxter was sentenced to ten years' imprisonment.

On February 8, 2008, the Court of Appeals for the District of Columbia affirmed. ***United States v. Hemphill***, 514 F3d 1350 (DC Cir. 2008). Baxter presented the following issues for

appellate review: (1) The government failed to prove the agreement element of conspiracy beyond a reasonable doubt; (2) The court erred when it failed to charge the jury on multiple conspiracies; (3) The indictment was insufficient to allege honest services; (4) The trial court's sentence must be vacated because the court failed to make necessary findings regarding scope of conspiracy or amount of the thefts. It appears that the Appellate Court did not address issue (3).

On January 12, 2009, the United States Supreme Court denied the petition for certiorari. ***Baxter v. United States***, 129 S.Ct. 985, 173 L.Ed. 2d. 170 (1/12/09).

## II. STATEMENT OF THE FACTS

In 1994, Barbara Bullock was elected president to the Washington Teachers Union ("WTU"). The slate of candidates included Esther Hankerson as Vice President and James Odell Baxter as Treasurer. (Tr. 605-606, 771-772).

As Treasurer, Baxter was a paid staff member and he was entitled to be paid under the Union's Constitution. (Tr. 1381-1382, 1800). Initially, Baxter worked at the Union full time. (Tr. 607). In addition to his duties as Union Treasurer, Baxter worked as a lobbyist (Tr. 646, 654, 655, 727, 1263, 1349, 1417, 1784-1785, 1789-1797).

Under the Union Constitution and By Laws, the Treasurer's duties included receiving and disbursing funds, countersigning checks, and maintaining financial records. (Tr. 607, 678, 778, 889). Even so, WTU employed an experienced bookkeeper, Santi Medina, and an office manager, Martha Britton who performed daily counting and record keeping functions for the WTU. Medina and Britton handled all of the financial responsibilities including previewing bills and preparing vouchers and checks for bill payments, reconciling bank records, preparing 990 tax reports to the IRS and LM-2 reports to the Department of Labor, maintaining financial records including the WTU's checkbooks and accounts. (Tr. 604, 609-615, 657-664, 881-884,

935, 937-938, 1537-1538, 1780, 2920, 2942, 2943, 2944, 3014). Baxter did not have access to the WTU's records, financial reports presented to the Board, including quarterly statements and proposed budgets which were prepared by Britton and Medina. (TR. 678-679, 733). As was the standard practice in the prior administration, Baxter was on occasion given blank checks to pre-sign in order to expedite payment of bills, payroll and overhead. (Tr. 615, 1930)

Within a year after the elections, Bullock, Henderson and Baxter were provided with American Express Cards ("AMEX"). (Tr. 619, 625, 626, 801-802, 891, 1261-1262, 1760). Baxter was assigned the role of program administrator for the American Express account. (Tr. 1760-1761).

Britton did not circulate the detailed American Express statements to Baxter. (Tr. 619-620, 625, 646, 664, 722). Baxter was given a summary statement of his own purchases. Since other WTU employees who worked outside the office received car stipends for gas, car repairs, meals and insurance, Britton believed that Baxter's purchases on the card relating to meals and automobile expenses were consistent with his lobbying activities. (Tr. 655-656). She never raised an issue about Baxter's use of the American Express card. (Tr. 678, 1799).

Like Baxter, Esther Hankerson was authorized to use her American Express card for meals and expenses. (Tr. 832-833, 895-901, 1798-1799). Hankerson also used the AMEX card for personal spending. (Tr. 986, 988, 1051-1055, 1799). Hankerson did not document which expenses were personal and which were Union related. She, Baxter and Bullock had an understanding that they would be given an opportunity to repay the Union for personal expenses following the next audit. (Tr. 957, 959, 998, 1031, 1038, 1341-1342, 1438, 1441-1444, 1446).

Baxter was not aware that Barbara Bullock was charging more than $10,000.00/month for personal shopping on her American Express Card. (Tr. 620-621, 629, 1261, 1264-1265).

Eventually, Britton told Baxter about Bullock's shopping spree with the AMEX card, and Baxter shared Britton's concern. According to Britton, Baxter was amazed at the amount of Bullock's bills and the kind of purchases she made. Initially, Baxter directed Britton to withhold payment on any further AMEX bills. (Tr. 621, 630-32, 634, 644, 652, 654). Baxter told Britton that the spending has got to stop. (Tr. 632-633). In an effort to control Bullock's spending spree, Baxter in two separate written requests in early 1996, directed American Express to place a spending limit on WTU's AMEX account in the amount of $5,000.00/month. (Tr. 666-677).

In late 1996, Britton was replaced by Gwendolyn Hemphill as office manager and executive assistant to Barbara Bullock. Hemphill was placed in charge of WTU's bookkeeping and financial management.(Tr. 649-650, 960, 694-695). Initially, Hemphill was assisted by Santi Medina who came to WTU's offices for a full day at least one a week to handle and review the accounts and financial matters. (Tr. 657-658). After Medina died in 1997, Bullock and Hemphill chose not to replace him with an experienced bookkeeper. Hankerson repeatedly asked Hemphill if she was up to the task. Hemphill reassured Hankerson that she could handle it. (Tr. 932-934, 941-942,  981). From then on, Hemphill handled all the finances, and maintained exclusive possession of all the Union's financial records and reviewed and prepared all invoices and checks for payment. (782, 885-886, 888, 933, 941-942, 945, 960, 981, 1559, 1563, 1568, 1575, 2920, 2942, 2987-2990). When the Union later hired a temporary accountant to help prepare reports to the Department of Labor, and the Internal Revenue Service, Hemphill hired and supervised them. (Tr. 1262).

Under Hemphill's regime, Baxter again did not maintain the financial records of the Union, receive statements from AMEX or prepare checks for payment. (Tr. 118-119). When Baxter presented quarterly reports and the proposed annual budget to the Board of Trustees,

Baxter explained that the information used for his report came directly from Hemphill. (Tr. 2990).

Initially, Bullock curtailed her spending to meet Baxter's proposed limit until 1997, when Medina died and Baxter left the Union's full-time employment to work for the Government of the District of Columbia (July, 1997). It was at this time that Bullock and Hemphill sought to undermine the spending limit imposed by Baxter by surreptitiously opening a second AMEX account with cards for each of them. (Tr. 1379, 1417, 1801, 1763, 1767). They removed Baxter as program administrator and had both account billing statements sent to Hemphill's home. They rescinded Baxter's $5,000.00 limit on all of the AMEX accounts. (Tr. 1262, 1367, 1592-1595, 1262, 1592-1594, 1760, 1767-1772, 1776-1778, 1883-1884, 1886, 1892, 1900-1901). At the trial, Bullock acknowledged that the changes to the AMEX account, including the opening of the second account, were made without Baxter's knowledge, and that Baxter was not an authorized user of the second account. (Tr. 1778, 1837). Hemphill and Bullock determined that the second account would be used solely for personal purchases, and thereafter, in a further attempt to deceive Baxter, Bullock never again used the original account for personal purposes. (Tr. 1367, 1673, 1696, 1843).

After Baxter was removed as program administrator, spending on the secret American Express account skyrocketed. (Tr. 1673, 1771). Bullock purchased hundreds of thousands of dollars in furs, flatware, expensive suits, shoes and jewelry. (Tr. 1267-1288, 1832-1837). For her part, Hemphill used the secret AMEX card to cater her son's wedding, as well as her annual New Year's and Valentine's Day parties. (Tr. 1288-1290, 1334-1336). Hemphill also used the AMEX card to pay for home renovations and a $13,000.00 television set. (Tr. 1594, 2340, 2357, 2364, 2477-2482, 2486-2487, 2498-2504, 2511-2513, 2552).

Without Baxter's knowledge, Hemphill devised a scheme to write checks to Bullock's driver, one Leroy Holmes, who cashed the checks, kept a portion as his "salary," and returned the rest to Hemphill. (Tr. 3021-3022, 3033, 3632, 3634). Hemphill deposited the cash she received from Holmes into Bullock's bank account (Tr. 3645-3646, 3660-3661, 3690-3691, 3696-3699, 3738-3739, 3742, 3780). One time, Holmes tried to cash a large WTU check at the Union's bank. He told the branch manager that he was a contractor. When the bank demanded that Holmes complete a financial reporting statement for checks cashed over $10,000, Holmes wrote checks for just less than that amount to avoid having to file the forms. (Tr. 3453, 3638).

To disguise the fraudulent nature of the checks written to Holmes, Hemphill included language in the memo line of the checks to make it appear that they were written for legitimate business transactions. (Tr. 3667). Many times, Hemphill would give Holmes checks with the name of the original payee crossed out, and Holmes name inserted in Hemphill's handwriting. (Tr. 3667-3673). Hemphill then forged Baxter's signature to the altered checks. (Tr. 3671-3675)

When Baxter left full-time employment with the Union to work for the Government of the District of Columbia, Holmes would see Baxter in the office about once a week to sign checks. (Tr. 3671). Holmes saw Hemphill place Bullock's stamp on blank checks that had been signed by Baxter. (Tr. 3671). One time, Hemphill asked Holmes to deliver checks to Baxter at his District of Columbia Government Office. When Baxter reviewed the check, he expressed surprise at how much Holmes was getting paid. (Tr. 3044, 3675-3678). Holmes lied to Baxter and told him the check was for two weeks pay. (Tr. 3678). That was the only time that Baxter saw a check made payable to Holmes. Baxter was not aware of amounts paid to Holmes because Holmes checks were not regular payroll checks issued by Paychex, but presigned blank checks. (Tr. 3677-3678). Holmes never deposited any money into any account maintained by Baxter and

never gave Baxter any cash from the checks he received from Hemphill. (Tr. 3679). Nor did

Holmes tell Baxter that he had been cashing Union checks and giving the cash to himself and

others. (Tr. 3679).

Hemphill also recruited her son-in-law, Michael Martin, to cash checks written to him by

Hemphill and deposit the cash into Bullock's personal account. (Tr. 2389, 2403-2404, 2407-

2408). Again, the memo lines on each check contained language designed to make it appear that

the checks were for legitimate services. (Tr. 2433-2434, 2437-2438, 2439, 2507-2510). When,

however, Martin became concerned about the number of checks written in his name, Hemphill

assured Martin that she would be the only person to see the checks. (Tr. 2404, 2429).

Increasingly fearful of detection, Hemphill proposed another scheme to Bullock.

Hemphill suggested forming another company to write checks for what would appear to be

legitimate business expenses. (Tr. 1344-1347, 1354, 1356, 1582, 1843, 2404). In furtherance of

the scheme, in later 1999-2000, Hemphill and Michael Martin approached Martin's friend Errol

Alderman, about using his dormant company, "Expressions Unlimited," as the fictitious

business entity. (Tr. 1696, 2404-2407, 2422-2424, 2439-2444). After Alderman and Martin

established a bank account for Expressions, Hemphill would call Martin to advise him that a

check was ready to be cashed. (Tr. 2408-2409, 2428, 2431, 2433, 2436, 2443, 2447, 2550, 2558-

2559, 2666).  Martin and Alderman would pick up the check from Hemphill, and go to

Expression's Bank where they either cashed or deposited the check. (Tr. 2407-2408, 2428-2429,

2431, 2447-2450, 2452, 2456, 2472, 2515). Martin would then deposit the cash or a check drawn

on Expressions Unlimited into Bullock's personal account pursuant to Hemphill's instructions.

(Tr. 2389, 2407-2409, 2421, 2426, 2444-2446, 2472-2550). Through Expressions unlimited,

Martin and his wife, Cheryl, had access to more than $500,000 in WTU funds to pay for fur

coats and health club premiums. (Tr. 2444-2445, 2464-2466). All of the schemes were concocted and executed after Baxter went to work for the District of Columbia. Significantly, none of the deposits were made into an account owned or controlled by Baxter. (Tr. 1343-1344, 1347-1348, 1613, 1843).

When Baxter left the Union in July 1997 (Tr. 4033, 4109-4110), he retained his paid elected position as the Union's treasurer. (Tr: 1381-1382, 1801). Baxter was granted a leave of absence from his full-time employment, but was still paid for his treasurer duties, such as signing checks, drafting letters, and attending board and executive committee meetings. (Tr. 901, 1379, 1380, 2905). Baxter's pay was authorized by the Union's Constitution and Bullock as president of the Union. (Tr: 1380-1382, 1801).[1] On the advice and instruction of Robin Klein, a Certified Public Accountant hired in 1997 to assist in preparing the Union's LM-2 report to the Department of Labor, Baxter was to continue to receive his pension payments of 11% of his salary. (Tr. 1384, 1413-1417). During this period, Baxter received pension payments to his WTU Plan account or, like Britton and others, directly as cash. (Tr: 717).

In about June 2000, Baxter returned to full-time work at the Union. (Tr: 841, 846, 903, 1801-1802). Bullock brought him back at first as a consultant, then, in April 2001, as a full-time salaried employee. Under the Constitution, Bullock had the power to re-hire Baxter without board's approval, and Bullock advised the board of trustees that she had rehired Baxter as a full-time employee. (Tr. 903, 1369, 1375-1376, 1378, 1801-1809, 1854, 1855, 2959-2965).

Although the Union's Constitution required an audit every two years (Tr: 890), the Union's last audit took place in 1995 for the years 1993 to 1995 representing the tenure of the

---

[1] Throughout Baxter's employment with WTU, he received W-2 and 1099 statements from Hemphill. All income and pension payments made to Baxter were reported to the Internal Revenue Service, and taxes were paid on the income reported. Hemphill did not report W-2 or 1099 non-payroll checks for Holmes, Bullock or herself.

prior administration. (Tr: 957, 1570). During her own tenure as president, Bullock never allowed a complete audit to be performed of the financial books under her administration. (Tr. 1340). In about 1998, Linda Jardine, an auditor with the accounting firm of Thomas Havey, was retained to complete an audit for 1995 to 1997. (Tr: 1139, 1341, 1496, 1574-1575, 1784). Bullock and Hemphill gave Jardine a list that falsely identified Bullock's personal expenses. (Tr: 1341, 1444, 1446). Jardine, however, never completed the audit. (Tr: 1575).

Eventually, WTU's parent, the American Federation of Teachers, specifically appealed to Bullock, then a member of the Executive Council of AFT, to complete an audit. (Tr: 1042, 1177-1179, 1184-1186, 1500). At one point in about 1998, AFT officials showed up at WTU offices to review the Union's books, and Bullock refused to allow the officials access. (Tr: 1024, 1172-1173, 1176).

When Medina died, according to Bullock, no one at the Union realized that IRS Form 990s needed to be completed since they had been previously completed by him. (Tr: 1564). As a result of the Union's failure to file, the Union was assessed a substantial tax delinquency. Hemphill and Bullock desperately did not want Baxter or the executive board to know about the delinquency, and surreptitiously negotiated with the IRS for a payment plan. (Tr: 1460, 1561, 1563-1567, 1843-1844). The Form 990s from 1999 to 2001 were prepared by Hemphill and retained bookkeeper, James Goosby, and signed by Hemphill, on Bullock's behalf. (Tr: 1437-1438, 1451-1453). Baxter never saw, prepared or signed any tax documents on behalf of the Union during his entire tenure as the Union's treasurer. (Tr: 1453).

By 2002, the Union's dues to the AFT were hopelessly in arrears in an amount over $650,000. (Tr: 1070, 1072, 1179, 1186, 1458). In February 2002, Bullock met with Edward McElroy, president of AFT, and negotiated a payment plan. (Tr: 1068-1070, 1108, 1177, 1179,

1181, 1183-1184, 1199, 1237, 1458-1459, 1505-1506).  Baxter was neither invited to nor informed of the meeting by Bullock or AFT officials. (Tr: 1108).  Bullock testified that she later told Hemphill about the payment plan (Tr: 1459), and AFT president Edward McElroy sent a letter confirming the payment agreement.  Though six people were sent carbon copies of the letter containing the payment plan, Baxter, the elected treasurer, was not one of them. (Tr: 1070-1073, 1109).  Because of Hemphill and Bullock's spending, however, they knew that the Union was not in a financial position to pay AFT under the repayment plan. (Tr: 1460).  According to Bullock, Baxter did not know that the Union was in debt and had no money to pay. (Tr: 1465).

As a result of a new Collective Bargaining Agreement with the District of Columbia Public Schools, the D.C. teachers were to receive a pay raise effective October 2001. (Tr: 1462).  When the contract was later ratified, therefore, in the spring of 2002, the teachers were due a retroactive paycheck dating back to October 2001. (Tr: 1462-1463, 1822).  Under ordinary circumstances, the Public Schools deduct from teachers' salaries Union dues payments, as advised by the President of the Union, and thereafter submit a lump sum check to the Union that represents payments of Union dues on behalf of teachers/members of the Union.  Accordingly, when the retroactive checks were forwarded to teachers, a lump sum payment was made to the Union.  Hemphill and Bullock devised a scheme to use the lump sum due from the teachers' retroactive Union dues checks to pay the Union's AFT dues arrearage and other outstanding debts. (Tr. 1465, 1506, 1844-1845).

Hemphill drew up a list of expenses, and Bullock and Hemphill determined how much money they needed from the retroactive checks. (Tr: 1466, 1506).  On or about April 27, 2002, Bullock sent a letter to the District of Columbia Public School's Office of Pay and Retirement requesting that $160.09 be deducted from each teacher's retroactive pay check.  Though Baxter

and Hankerson were usually carbon copied on such letters to the school system affecting

teachers' dues, neither Baxter nor Hankerson were carbon copied on this letter.

   As a result of an uproar by the D.C. teachers regarding what they believed to have been

excessive amounts the retroactive dues deducted, AFT began an investigation and audit of the

Union's funds.  Hankerson assigned Hemphill, who was the custodian of the Union's records, as

the point person to gather information AFT needed for the forensic audit. (Tr: 836).  Instead of

cooperating with the investigation, though, Hemphill and Bullock manufactured fictitious

Expressions Unlimited invoices to match the bogus checks written to it. (Tr: 1631-1632).

Bullock and Hemphill also instructed Holmes on what he should tell the investigators. (Tr: 3720-

3721, 3782).

## III. GROUND ONE: THE CONVICTION WAS OBTAINED AND SENTENCE IMPOSED IN VIOLATION OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT ALL CRITICAL STAGES

## A. LEGAL PRINCIPLES APPLICABLE TO CLAIMS OF INEFFECTIVE ASSISTANCE BASED ON INADEQUATE LEGAL ASSISTANCE

   *Strickland vs. Washington*, 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674

(1984) established a two-pronged-test for evaluating claims of ineffective assistance based on

inadequate legal assistance.

   First, the moving party in a 2255 motion must plead and eventually prove that his

attorney made one or more errors. *Kimmelman vs. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574,

91 L.Ed.2d 305 (1986) states, "a single serious error may support a claim of ineffective

assistance of counsel." The Court added that "this single serious error" could cause counsel's

performance to fall "below the level of reasonable professional assistance" even where "counsel's

performance at trial was generally creditable enough," and even where counsel made "vigorous

cross-examination, attempts to discredit witnesses, and an effort to establish a different version

of the facts." Id. 477 U.S. at 386. ***Murray vs. Carrier***, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d

397 (1986).

    ***Strickland*** recognized that an attorney's duty to provide reasonably effective assistance

includes "the duty to make reasonable investigations or make a reasonable decision that makes

particular investigations unnecessary." ***Strickland,*** 466 U.S. at 691, 104 S.Ct. at 2052;  see also

ABA Standards for Criminal Justice: Prosecution Function and the Defense Function 4-4.1(a)

(3d Edition 1993)("Defense counsel should conduct a prompt investigation of the circumstances

of the case and explore all avenues leading to facts relevant to the merits of the case…").

Strategic choices made after a thorough investigation of the facts are entitled to a presumption of

validity. Strategic decisions after a less than complete investigation are reasonable precisely to

the extent that reasonable professional judgments support the limits of the investigation. Failure

to conduct any pretrial investigation is objectively unreasonable. ***Rolan v. Vaughn***, 445 F3d 671,

682 (3d Cir. 2006).

    An attorney's decision not to pursue a specific course of action is not entitled to

deference as "strategic" unless it is a choice made after "a reasonable investigation of the factual

scenario."   A decision by counsel not to present a specific defense is not entitled to deference

where the decision is uninformed. ***Rolan v. Vaughn***,  445 F3d 671, (3d Cir. 2006).

>     ***Strickland*** and it progeny make clear that counsel's strategic choices
> will not be second-guessed by *post-hoc* determinations that a different
> trial strategy would have fared better. 466 U.S. at 689.  However, there is
> a prerequisite to this rule's application.  Only choices made after a  reasonable
> investigation of the factual scenario are entitled to a presumption of validity.Id.,
> at 690-91. …Failure to conduct any pretrial investigation is objectively
> unreasonable. e.g. ***United States v. Gray***, 878 F2d 702, 711 (3d Cir. 1898).
> The district court noted that Goldstein never attempted to contact either Vargas
> or Aponte after Rolan gave Goldstein their names. Goldstein did turn their
> names over to the prosecution as potential *alibi* witnesses, as required by
> Pennsylvania law, but after the prosecution told Goldstein that they were not alibi
> witnesses,  Goldstein made no attempt to determine whether they might have

other information potentially valuable to the defense.  Although the decision to forgo a self-defense claim is of the type that may be entitled to a presumption of validity, Goldstein's decision not to present the defense cannot be accorded the normal deference to strategic choices because it was uninformed.  See United States v. Kauffman, 109 F3d 186, 190 (3d Cir. 1997).  Thus, we conclude that Goldstein's representation of Rolan fell below the objective standard of reasonableness. ***Rolan*** at 681-682.

In ***United States v. Gray,*** 878 F2d 702 (3d Cir. 1989), defense counsel had the names of at least four witnesses who had observed the criminal incident, but made no effort to contact any of the known witnesses.  Counsel did not hire an investigator and offered no strategic justification for his failure to investigate the case.  The court in ***Gray*** found that "counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence…" ***Gray*** at 712.

***Gray*** also notes that the defendant's burden under the second prong of ***Strickland*** is to "establish a reasonable probability – one sufficient to undermine our confidence in the outcome—that the jury's verdict would have been different if not for counsel's errors.  See ***Strickland*** , 466 U.S. at 695.  ***Gray*** at 712.  In determining whether a defendant suffered prejudice, "the effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." ***Gray*** at 710-711, quoting ***Strickland*** , 466 U.S. at 696.

The right to effective assistance of counsel includes the right to have the lawyer adequately investigate the facts and prepare the case for plea or for trial. ***Powell vs. Alabama***, 287 U.S. 45, 57-58, 53 S.Ct. 55, 77 L.Ed. 158 (1932)[presuming prejudice where there was "no attempt made to investigate" noting that "consultation, thoroughgoing investigation and preparation are vitally important" in providing effective representation].

Second, the moving party must plead and eventually prove that the error or errors prejudiced some aspect of the case**.**  Prejudice is a "reasonable probability" which is defined as a probability sufficient to undermine confidence in the outcome. A reasonable probability is a standard **less demanding standard** than "more likely than not." ***Strickland***, 466 U.S. at 693-94, 104 S.Ct. at 2052, ***Mask vs. McGinnis***, 233 F3d 132, 139 (2d Cir. 2000), ***Thomas vs. Varner***, 428 F3d 491 (3d Cir. 2005). The petitioner does not have to show that counsel's deficient performance more likely than not affected the outcome of the case. Instead, the petitioner must show only a "reasonable probability" of a different outcome.

***Williams v. Taylor***, 529 U.S. 362, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) reads, in pertinent part, as follows:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different", "opposite in character or nature," and "mutually opposed to our clearly established precedent because we held in ***Strickland*** that the prisoner need only demonstrate a "reasonable probability that…the result of the proceeding would have been different.

***Julian v. Bartley***, 495 F3d 487, 498 (7th Cir. 2007)["To meet the second prong of Strickland--prejudice--the defendant must show there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. "A defendant need not show that counsel's deficient performance more likely than not altered the outcome in the case." ***Id*** at 693.] The chances of prejudice need be only better than negligible. ***Canaan v. McBride***, 395 F3d 376, 386 (7th Cir. 2005)

***Strickland vs. Washington***, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) states that a claim of ineffective assistance of counsel requires the reviewing court to consider the **"totality of the evidence"** before the judge or the jury. "Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inference to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been affected but for the errors."

With respect to appellate litigation, the United States Supreme Court has recognized that appellate practice is governed by a set of rules and requires a set of skills unfamiliar to most lay people. ***Evitts v. Lucy***, 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821, 830 (1985). A criminal appellant requires, and is constitutionally entitled to "careful advocacy to ensure that rights are not foregone and that substantial legal and factual arguments are not inadvertently passed over." ***Penson v. Ohio***, 488 U.S. 75, 85, 109 S.Ct. 346, 352, 102 L.Ed.2d 300, 311 (1988). Appellate counsel is presumed effective and it is the movant's obligation to show otherwise. The movant can meet this burden by making a comparison between the issues raised and the issues not raised. If the issue or issues not raised are clearly stronger than the issues raised, then appellate counsel is constitutionally ineffective. ***Sanders vs. Cotton***, 398 F3d 572, 585 (7th Cir. 2005), ***Ramchair v. Conway***, 601 F3d 66, 77 (2d Cir. 2010).

**B. TRIAL COUNSEL FAILED TO CONDUCT A REASONABLY ADEQUATE PRETRIAL INVESTIGATION AND CALL WITNESSES NECESSARY TO REFUTE THE GOVERNMENT'S ALLEGATIONS AGAINST BAXTER**

**1. Trial counsel failed to investigate and obtain medical records of the government's most important witness, Barbara Bullock, and failed to call a medical expert to explain the probable effects of Ms. Bullock's mental illness on her ability or willingness to give truthful testimony.**

Barbara Bullock pled guilty in October, 2003 and was sentenced on January 30, 2004. Ms. Bullock was the only conspirator to make the claim that Baxter was a participant in a scheme to defraud the WTU. Bullock testified in exchange for leniency.

At Bullock's initial sentencing, Ms. Bullock attributed her behavior to bipolar disorder. At trial, Bullock's inconsistent and contradictory testimony, mood changes and behavior raised questions about her physical, emotional, and psychological fitness and her ability and willingness to give truthful testimony.

Trial counsel should have conducted a reasonably thorough investigation into Ms. Bullock's bipolar disorder, obtained her medical records including medications prescribed to control the disorder. Trial counsel could have used the records and an expert witness to impeach and attack Ms. Bullock's ability and willingness to tell the truth.

If trial counsel had conducted a reasonably adequate pretrial investigation, there was a reasonable probability of a different outcome because Ms. Bullock's testimony was a crucial part of the government's case against Mr. Baxter. *Tucker v. Prelesnick*, 181 F3d 747, 756 (6th Cir. 1999)[found that an attorney's failure to obtain medical records casting serious doubt on the reliability of the prosecution's sole witness and failure to use contradictory statements of the witnesses was so serious as to deprive the defendant of a fair trial worthy of confidence], *Bell v.*

*Miller*, 500 F3d 149, 156-157 (2d Cir. 2007)[attorney ineffective for failing to obtain medical records that could have been used to impeach prosecution witness.].

The failure to investigate relevant medical evidence that could have been used to impeach the government's main witness states a claim of ineffective assistance of counsel.

**2. Ineffective assistance of counsel at sentencing**

Please refer to the pro-se 2255 motion and memorandum of law for explanation of this issue.

**3. Ineffective assistance of appellate counsel**

Please refer to pro-se 2255 motion and memorandum of law for explanation of this issue.

**IV. THE CONVICTION WAS OBTAINED AND SENTENCE IMPOSED IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

**A. ACTUAL, FACTUAL INNOCENCE OF HONEST SERVICES FRAUD BASED ON AN INTERVENING CHANGE IN THE LAW**

*Skilling v. United States*, 130 S.Ct. 2896, 177 L.Ed.2d 619, 2010 U.S. Lexis 5269 (6/24/10) decriminalized honest services fraud not involving involved bribery or kickbacks.

*Skilling*, the former chief executive officer at Enron Corporation, was convicted of participating in a scheme to deceive investors about Enron's true financial performance by manipulating publicly reported financial results and making false and misleading statements. Count One of the indictment charged Skilling with honest services wire fraud in violation of 18 U.S.C. 371, 1343 and 1346 by depriving Enron and its shareholders of the intangible right to his honest services. The Supreme Court reversed the conviction for honest services wire fraud. The Supreme Court held that 18 U.S.C. 1346 criminalizes only fraudulent schemes involving bribery and kickbacks.

*Skilling* is retroactive to collateral review because it decriminalized conduct formerly considered criminal.[2]

      ***Bousley v. United States***, 523 U.S. 614, 620, 118 S.Ct. 1601, 140 L.Ed.2d 828 (1998)[Change in the law rendering a person actually innocent is retroactive to 2255 motion].

      ***Stocker* vs. *Warden*,** 2004 U.S. Dist. Lexis 5395 [EDPA, Giles, C.J.][Serial habeas corpus granted based on change in the law which rendered Stocker actually innocent of a violation of Pennsylvania Corrupt Organizations Act].

      In the present case, the conviction on Count One must be vacated because it alleges multiple object offenses including as an object the deprivation of the right to honest services theory rendered invalid by ***Skilling***, and there is no basis to conclude that the convictions were not based on the invalid theory of liability.

      ***United States vs. Syme***, 276 F3d 131, 144 (3d Cir. 2002) states:

> As we noted above, the prosecution has presented
> alternative theories of guilt to support each count of
> the indictment. Each count rests on two or more of
> the four main theories that the government presented...
> When a criminal defendant appeals a conviction in which
> the prosecution presented more than one theory of guilt and
> the jury returned a general verdict, we apply the holding of
> *Griffin vs. United States*, 502 U.S. 46, 112 S.Ct. 466,
> 116 L.Ed.2d 371 (1991). *Griffin* restated the longstanding rule
> that if the evidence is insufficient to support a conviction
> on one alternative theory that was charged to the jury in the
> same count, then a reviewing court should assume that the
> jury convicted on the factually sufficient theory and should
> let the verdict stand ...However, under *Griffin*, if one of two
> or more alternative theories supporting a count of conviction
> is either (1) unconstitutional, or (2) legally invalid,
> then the reviewing court should vacate the jury verdict

---

[2] See ***United States v. Leslie***, 2010 U.S. Dist. Lexis 81800 (MDLA 2010)[Indictment based on deprivation of right to honest services dismissed because Leslie's alleged activities did not involve bribery or kickbacks], ***United States v. McGeehan***, 625 F3d 159 (3d Cir. 2010)[for honest services fraud vacated].

> and remand for a new trial without the invalid or
> unconstitutional theory. Id at 56, 112 S.Ct. 466 (citing
> *Stromberg vs. California*, 283 U.S. 359, 367-368, 51 S.Ct.
> 532, 75 L.Ed. 1117 (1931)(reversing a conviction where
> one of the alternative theories of guilt was unconstitutional)
> and *Yates vs. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064,
> 1 L.Ed.2d 1356 (1957)(reversing a conviction where one of the
> possible grounds was legally invalid because it was time- barred).

Errors in jury instructions does not automatically require that a conviction be vacated. As the *Skilling* Court explained, where a jury returns a general verdict that may rest on a legally invalid theory, the conviction may be upheld under a harmless-error analysis. 130 S. Ct. at 2934. Harmless error review means that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." FED. R. CRIM. P. 52(a). *Skilling* cited *Hedgpeth v. Pulido*, 555 U.S. 57, 129 S. Ct. 530, 531, 172 L. Ed. 2d 388 (2008), where the Court instructed that "a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth*, 555 U.S. 57, 129 S. Ct. 530, 531, 172 L. Ed. 2d 388 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)), cited in *Skilling*, 130 S. Ct. at 2934 n.46. That standard, the Court made clear, applies on direct review of a conviction as well as on collateral review. *Id.* at 2934 n.46.

Turning to the present case, it is clear that Baxter's conviction on Count One was based on the invalid honest services theory, because there was ample evidence indicating that Baxter failed to satisfy his fiduciary obligation to  report embezzlement by the WTU's President, but no evidence that Baxter himself accepted salary, pension and benefits to which he was not entitled. The honest services instruction had a substantial and injurious effect.

Assuming the Court vacates the conviction and sentence on Count One, then the convictions and sentences on the rest of the counts must be vacated because the government requested, and the district court gave a ***Pinkerton*** instruction authorizing the jury to convict the Petitioner of all acts committed by alleged co-conspirators during the course of the alleged conspiracy to commit honest services mail and wire fraud. [Tr. 7065-67]. The jury is presumed to follow the instructions. Here, the instructions authorized convictions for counts charging substantive offenses even if the jury found that ***Petitioner*** did not participate in the acts charged in the counts.[3]

***United States v. Howard***, 517 F3d 731, 736 (5th Cir. 2008) states, "The decision in this case turns on the application of ***Yates***, which holds that a conviction must be vacated if a legally invalid theory was submitted to the jury and it is impossible to tell whether the jury's verdict of guilt relied on the invalid theory."

In ***Howard***, supra at 517 F3d 731 (5th Cir. 2008), the district court reversed all convictions under circumstances similar to the case at bar. The district court reversed a conviction for conspiracy to commit honest services mail fraud and then reversed convictions for all counts that could have been the consequence of the ***Pinkerton*** charge because it was not possible to say whether the convictions on the substantive counts were based on the actions of the co-conspirators attributed to Howard under the ***Pinkerton*** theory.

Turning back to the case at bar, Mr. Baxter was charged with engaging in a scheme to defraud the WTU under an assortment of theories including the theory of deprivation of the right to honest services.

---

[3] Tellingly**,** the prosecution relied on the Pinkerton theory in its closing argument. [Tr. 6705-06]. The judge gave a Pinkerton instruction. Finally, ***United States v. Hemphill,*** 514 F3d 1350, 1362-1365 (DC Cir. 2008) indicates that the substantive offenses committed by other members of the alleged conspiracy were attributed to Baxter under the ***Pinkerton*** theory.

The ***Skilling*** decision decriminalized all honest services mail fraud, wire fraud, and other kinds of fraud unless the scheme involved bribery or kickbacks. Baxter's case did not involve bribes and kickbacks. Accordingly, Baxter is actually, factually innocent of honest services mail or wire fraud.

The convictions for fraud must be reversed because they violate the holding in ***Skilling***. The convictions for making false statements are inextricably intertwined with the conviction for fraud convictions, and they must be reversed because all the counts are linked by the ***Pinkerton*** instruction given in connection with the conspiracy count. ***United States v. Howard***, 517 F3d 731 (5th Cir. 2008).

In the present case, the charging and instructional errors had a substantial and injurious effect. The charges against Baxter appear to stem from the failure of Baxter to fulfill fiduciary responsibilities to the WTU by reporting Bullock's fraudulent conduct to the authorities and otherwise taking appropriate steps to protect the WTU from exploitation by the Union President. The charges do not appear to stem from Baxter himself embezzling from the WTU.

More likely than not the convictions were based on the actions of co-conspirators as opposed to the actions of Baxter because there was no evidence that the salary and pension payments received by Baxter were illegal or improper. Tellingly, at sentencing, the judge had the opportunity to make a ruling that payments to Baxter were fraudulent, but he declined.

The cornerstone of the Government's case against Baxter was that he failed to act with the care and diligence one would expect of the Treasurer of the WTU, and that he failed to report the acts and omissions of Bullock. The core of the Government's case against Baxter was honest services fraud. ***Skilling*** rendered this theory of liability non-criminal.

All convictions should be vacated.

## B. ACTUAL, FACTUAL INNOCENCE OF MONEY LAUNDERING BASED ON AN INTERVENING CLARIFICATION OF THE LAW

Petitioner's appeal was argued November 15, 2007. The appeal was decided February 8, 2008.

While Petitioner's appeal was pending, the Court of Appeals decided **United States v. Adefehinti**, 510 F3d 319, 324 (DC Cir. 12/18/07) which states:

To convict a person for money laundering under 18 U.S.C. 1956(a)(1)(B)(i), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew the proceeds were from unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part--(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity

**Adefehinti** states that the "transaction or transactions that created the criminally derived proceeds must be distinct from the money laundering transaction."

Under **Adefehinti**, the Petitioner is actually innocent of money laundering because no matter how the facts are twisted, the transactions that created the criminally derived proceeds are not separate and distinct from the money laundering transactions.

It was for this reason that the district court, at sentencing, correctly stated that the alleged "money laundering" in Baxter's case was not sophisticated, sufficiently detailed or complex to warrant the two level increase.

The convictions and sentences for money laundering must be vacated.

## C. GOVERNMENT'S SUPPRESSION OF BRADY MATERIAL

**Banks vs. Dretke**, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) reads, in pertinent part, as follows:

*Brady*, we reiterate, held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. 83 at 87, 10 L.Ed.2d 215, 83 S.Ct. 1194. We set out in *Strickler vs. Greene*, 527 U.S. 263, 281-82, 144 L.Ed.2d 286, 119 S.Ct. 1936 (1999) the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281-282, 144 L.Ed.2d 286, 119 S.Ct. 1936. Corresponding to the second *Brady* requirement (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of "cause and prejudice"  requirement exists when the suppressed evidence is "material" for *Brady* purposes.  527 U.S. 263 at 282, 144 L.Ed.2d 286, 119 S.Ct. at 1936. ***Banks*** at 1272...


"Unless suppressed evidence is material for Brady purposes, its suppression does not give rise to sufficient prejudice to overcome a procedural default." *Strickler*, 527 U.S. 263 at 282, 144 L.Ed.2d 286, 119 S.Ct. 1936. Our touchstone of materiality is *Kyles vs. Whitley*, 514 U.S. 419, 131 L.Ed.2d 490, 115 S.Ct. 1555 (1995). *Kyles* instructed that the materiality standard for *Brady* claims is met when the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 514 U.S. 419 at 435, 131 L.Ed.2d 490, 115 S.Ct. at 1555. See also 514 U.S. at 419, 434-435, 131 L.Ed.2d 490, 115 S.Ct. 1555 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence there would have been enough left to convict."); accord, *Strickler,* 527 U.S. 263 at 290, 144 L.Ed.2d 286, 119 S.Ct. 1936. In short, Banks must show a "reasonable probability" of a different result. ***Banks*** at 1276


***Youngblood v. West Virginia***, 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269

(2006) indicates that the ***Brady*** rule applies to the prosecution and law enforcement officials.

On January 30, 2004, at her sentencing hearing, Barbara Bullock blamed her crimes on

bipolar disorder. The Government was informed of the severity of the disorder, and the need for

medication to control it.

On January 23, 2007, Ms. Bullock was given a 2-1/2 year sentence reduction as an award for her testimony against Baxter.

Although the Government knew about Bullock's medical condition and the medical challenges facing her as a person afflicted with bipolar disorder, the government suppressed this information.

Bipolar disorder is material because it casts doubt on the ability and willingness of Ms. Bullock to tell the truth.

Without full disclosure, cross-examination was ineffective because trial counsel could not sensibly question Bullock regarding the effect of the disease and the medications on her ability and willingness to tell the truth.

Because Ms. Bullock was a central witness against Mr. Baxter, the failure to disclose the illness and all of the medical records regarding Ms. Bullock was a material violation of the *Brady* rule.

## V. CONCLUSION

The 2255 motion should be GRANTED. In the alternative the district court should order an expansion of the record and hold an evidentiary hearing.

<u>/s/Cheryl J. Sturm</u>
CHERYL J. STURM
Attorney-At-Law
387 Ring Road
Chadds Ford, PA 19317
Telephone Number: 484/ 771-2000
Facsimile Number: 484/771-2008
E-Mail: sturmcj@aol.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the  23rd day of  January, 2011, the Supplemental

Memorandum was electronically filed and is available for viewing and downloading from the

CM/ECF system.

Sherri Lea Berthrong, Esq.
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530


Dated:  January 23, 2011                    /s/Cheryl J. Sturm