# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 9, 2014        Decided August 8, 2014

No. 12-3074



UNITED STATES OF AMERICA,
APPELLEE

v.

JAMES ODELL BAXTER, II,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:03-cr-00516-1)

———

*Cheryl J. Sturm* argued the cause and filed the briefs for appellant.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *Sherri Berthrong*, Assistant U.S. Attorneys. *Suzanne G. Curt*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

2

GARLAND, *Chief Judge*  James O  Baxter, II was convicted on multiple counts of defrauding the Washington Teachers Union  We have previously described the charges against him as arising from "a seven-year orgy of greed," during which he and others "stole millions of dollars" from the union  *United States v  Hemphill*, 514 F 3d 1350, 1353 (D C  Cir  2008)  Baxter now appeals the district court's denial of his motion to vacate his convictions pursuant to 28 U S C  § 2255  Although we grant Baxter's motion for a certificate of appealability to consider two of his three challenges, we conclude that he is not entitled to relief and therefore affirm the judgment of the district court

I

The following description of the facts is taken from the trial record and from this court's decision on direct review of Baxter's convictions, *Hemphill*, 514 F 3d at 1353-54, 1361-63

In 1994, the Washington Teachers Union (WTU) elected new leadership, including Barbara Bullock as president, Esther Hankerson as vice president, and James O  Baxter, II as treasurer  In 1996, Bullock hired Gwendolyn Hemphill as her executive assistant and WTU office manager  At all relevant times, Baxter was the WTU's treasurer  As treasurer, one of his duties included countersigning checks (also signed by either Bullock or Hankerson) for the WTU account  Bullock, Baxter, and Hemphill, with the help of other coconspirators, defrauded the WTU of millions of dollars between 1995 and 2002  *See Hemphill*, 514 F 3d at 1353-54

The fraud was effectuated in several ways  One involved WTU American Express cards, issued to Bullock, Hankerson, and Baxter, which the conspirators used to charge thousands of dollars in personal expenses  *Hemphill*, 514 F 3d at 1353-54

Bullock's spending was particularly extravagant It totaled more than $1 2 million and included custom-made clothing, silverware, crystal, and a piano J A 604, 607-17, 917-19 (Bullock Test ) [1] Some of the credit card bills were paid directly with WTU checks signed by Bullock and Baxter Id at 612-14, 650

In addition, Hemphill wrote and Baxter signed WTU checks to Bullock's driver, Leroy Holmes, for amounts far in excess of Holmes' salary Holmes then cashed the checks, giving some money to Hemphill and depositing other money in Bullock's personal account *Hemphill*, 514 F 3d at 1354 Similarly, Hemphill wrote and Baxter signed checks to a shell corporation, Expressions Unlimited, that Hemphill's son-in-law, Michael Martin, and his friend, Errol Alderman, created *See Hemphill*, 514 F 3d at 1363, J A 1347-49, 1364-68 (Martin Test ) Martin deposited some of the checks in Expressions Unlimited's account and cashed others Thereafter, he and Alderman wrote checks to Bullock on Expressions' account, which they deposited in her personal account along with the money from the checks they had cashed J A 1354-55, 1367-70 (Martin Test ) Bullock then wrote checks on her personal account to pay some of the American Express bills J A 668-69 (Bullock Test ) Apparently she did so to make it seem that she was paying for personal expenditures out of her personal account, when in fact the money Bullock used came from the union

Baxter personally benefitted from the fraud He wrote several checks to himself on the WTU general account, which he designated as "pension" payments during a period of time when no other employee was receiving pension payments

---

[1] When asked at trial whether it was fair to say that she liked to shop, Bullock responded "No, that's not fair I love to shop " J A 601

4

because there was no money in the WTU pension fund
*Hemphill*, 514 F 3d at 1362-63, J A 693-95, 724-28 (Bullock
Test) He also used union funds and the WTU credit cards to
make personal purchases, including $19,660 for Washington
Wizards basketball tickets for his and his coconspirators'
personal use, and $5,000 in art for his home *Hemphill*, 514
F 3d at 1362-63

The government also presented evidence of Baxter's
involvement in concealing the crimes He signed numerous
fraudulent checks to himself, Bullock, Hemphill, Holmes, and
Expressions Unlimited *Id* at 1363 In addition, he signed a
fraudulent LM-2 (an annual financial report made by the WTU
to the Internal Revenue Service) that did not include money paid
to Hemphill or Holmes, even though notes recovered from his
house recorded those payments *Id* at 1362 In Baxter's files,
the government recovered drafts of fraudulent financial reports
that his coconspirators had faxed to him *Hemphill*, 514 F 3d at
1362 One of those drafts contained handwritten notes showing
how to falsely allocate the debits -- arising from the
conspirators' personal American Express charges -- to other
budget categories *Id* Over half a million dollars in such
charges were reclassified to the "employee benefit expense" and
"travel and meeting expense" categories on those fraudulent
financial documents *See* Jury Trial Tr 5490, *United States v
Baxter*, No 03-CR-516 (D D C Aug 10, 2005)

By early 2002, the fraud had so depleted the union's funds
that it could not pay membership fees it owed to its parent
organization, the American Federation of Teachers (AFT) The
coconspirators then devised a scheme to make up the shortfall
*Hemphill*, 514 F 3d at 1354 Under a collective bargaining
agreement that the WTU had reached with the District of
Columbia Public Schools, the WTU's member teachers were
entitled to a pay raise As a result, each teacher owed a

5

supplemental lump sum dues payment to the WTU   J A 773-74
(Bullock Test )  Properly calculated, that dues payment was not
enough to make up the shortfall, so the conspirators simply
changed that amount   Instead of deducting $16 09 in union dues
from each teacher's paycheck, Baxter proposed deducting
$160 09 and, if discovered, passing it off as a clerical error
*Hemphill*, 514 F 3d at 1354, 1362   Teachers who noticed the
discrepancy alerted the AFT, which then contacted federal
authorities   *Hemphill*, 514 F 3d at 1354

After the government was alerted to the situation, the FBI
recovered evidence from Baxter's home computer that showed
the extent of his involvement in the dues scheme, as well as in
a potential further cover-up   The WTU had sent a letter to the
District of Columbia Office of Pay and Retirement, instructing
the Office to deduct the $160 09 from the teachers' paychecks
An FBI computer specialist found a copy of the letter with the
$160 09 figure in Baxter's email outbox   That letter was last
printed on April 17, 2002   But the FBI specialist found that the
letter had been saved again on September 23, 2002 -- after the
investigation began -- in Baxter's "My Documents" file   This
time, the letter used the $16 09 amount   *See* Jury Trial Tr 3836-
50, *United States v Baxter*, No  03-CR-516 (D D C  July 14,
2005)

A grand jury indicted Baxter, Hemphill, and James A
Goosby (the WTU's accountant) on November 20, 2003
Bullock, Holmes, Martin, and Alderman all pled guilty and
testified for the government   Baxter was charged in 23 counts,
including conspiracy to commit fraud and other offenses, wire
fraud, mail fraud, making false statements, embezzlement from
a labor union, theft, money laundering, and conspiracy to
commit money laundering   J A 219-59   The trial against the
three defendants lasted twelve weeks   The jury acquitted
Goosby, but convicted Baxter and Hemphill on all counts

6

*Hemphill*, 514 F 3d at 1354   On June 5, 2006, Baxter was sentenced to 120 months' imprisonment   *Id*

Baxter and Hemphill appealed, and on February 8, 2008, this court affirmed the district court's judgment as to both defendants on all counts   *Id* at 1353   The Supreme Court denied Baxter's petition for certiorari on November 10, 2008, *Baxter v United States*, 555 U S  1020 (2008), and denied his petition for reconsideration on January 12, 2009, *Baxter v United States*, 555 U S  1130 (2009)

On January 11, 2010, Baxter filed a motion to vacate his sentence pursuant to 28 U S C  § 2255 [2]  The district judge denied Baxter's motion for § 2255 relief on August 28, 2012, based on "the parties' briefs," "the entire record," and the knowledge the judge acquired from "[h]aving presided over petitioner's trial and sentencing "  J A  480-81  On November 9, 2012, Baxter applied for a certificate of appealability, which the judge denied on January 10, 2013   J A  485

Thereafter, Baxter filed a notice of appeal from the denial of his § 2255 motion and moved for a certificate of appealability from this court   In challenging his conviction, Baxter raises three principal claims   First, he argues that the government

---

[2] Section 2255 provides

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States    may move the court which imposed the sentence to vacate, set aside or correct the sentence

28 U S C  § 2255(a)

7

violated its obligations under *Brady v Maryland*, 373 U S 83 (1963), when it failed to turn over evidence that Bullock suffered from bipolar disorder   Second, he argues that his conviction for conspiracy to commit fraud and other offenses must be vacated because it was based on an honest-services fraud theory that is invalid under *Skilling v United States*, 561 U S 358 (2010)   Finally, he argues that his conviction for money laundering and conspiracy to commit money laundering is invalid under this court's decision in *United States v Adefehinti*, 510 F 3d 319 (D C Cir 2007)   We consider these arguments in Parts II, III, and IV below

II

Barbara Bullock pled guilty to the fraud and associated charges that are the centerpiece of this appeal   At her January 2004 public sentencing hearing, she sought leniency on the ground that she suffered from bipolar disorder, which she claimed gave rise to her "obsession with shopping"   Sent'g Tr 21 (Gov't Supp App'x 25), *United States v Bullock*, No 03-CR-435 (D D C Jan 30, 2004)   Baxter's trial commenced in May 2005, more than a year later, and Bullock testified against him   Baxter charges that the government failed to disclose Bullock's bipolar disorder prior to trial, and that the failure violated its responsibilities under *Brady v Maryland*   The government responds that *Brady* does not require disclosure of the information concerning Bullock's disorder because that information was not material [3]

---

[3]The government also argues that the information does not fall within the *Brady* rule because the government did not "withhold" or "suppress" it, since it was part of Bullock's testimony at her January 2004 public sentencing hearing, and the transcript was filed on the district court's public docket in June 2004   Gov't Br 14   Because we conclude that Baxter has failed to show the information was material

8

"Unless a    judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from    the final order in a proceeding under section 2255 " 28 U S C § 2253(c)(1)(B)    When the district judge has denied a certificate, as the judge did here, the applicant may seek one from the court of appeals    Fed R App P 22(b)    The Antiterrorism and Effective Death Penalty Act (AEDPA) provides that such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right " 28 U S C § 2253(c)(2), see Slack v McDaniel, 529 U S 473, 483-84 (2000)    This means that the prisoner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right " Slack, 529 U S at 478

Under Brady, "the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment " Smith v Cain, 132 S Ct 627, 630 (2012)    "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different " Id (internal quotation marks omitted)    It is the "petitioner's burden    to establish a reasonable probability of a different result " Strickler v Greene, 527 U S 263, 291 (1999), see United States v Johnson, 519 F 3d 478, 488 (D C Cir 2008)

Baxter has not even attempted to show how evidence of Bullock's bipolar disorder might have changed the outcome of his trial    The only thing he says is that he could have used it "effectively to impeach" her testimony, Baxter Br 26, and that "[b]ipolar disorder is material because it casts doubt on the ability and willingness of Ms Bullock to tell the truth," id at 43

---

under Brady, we do not address this argument

9

But he does not say *how* he would have used evidence of this illness to impeach her testimony or *why* it would have cast doubt on her ability or willingness to tell the truth  We have no doubt that medical records can be the "grist for effective cross-examination," Reply Br  18, but such a conclusory assertion is insufficient to establish materiality  *Cf United States v George*, 532 F 3d 933, 937 (D C  Cir  2008) (holding that a district court did not err in barring cross-examination about a witness' bipolar disorder because nothing in the defendant's proffer indicated that it "would reasonably cast doubt on her ability or willingness to tell the truth"), *id*  ("Mental illness is not a generic badge of incompetence or dishonesty ")  Bullock was extensively cross-examined at trial, particularly on the ground that her desire for a reduced sentence gave her a motive to inculpate Baxter, and he does not explain what additional impeachment value her disorder would have had

Moreover, even if the evidence could have been used to successfully impeach Bullock, the probability of a different outcome depends on the context of all of the evidence offered at trial  *See Smith*, 132 S  Ct  at 630  Other than declaring that Bullock was a "crucial witness," Baxter Br  43, Baxter does not explain why her impeachment would likely have resulted in a different verdict  To the contrary, the evidence of Baxter's guilt was overwhelming, even if Bullock's testimony had been compromised  *See Hemphill*, 514 F 3d at 1362-63  Baxter's mere declaration to the contrary is insufficient to meet his burden [4]  Accordingly, we conclude that Baxter has not stated a

---

[4] Baxter makes the related claim that his trial counsel was ineffective under *Strickland v  Washington*, 466 U S  668 (1984), for failing to discover that Bullock suffered from bipolar disorder  Because one prong of the *Strickland* test requires a defendant to show prejudice from any alleged ineffectiveness of counsel, this claim fails for the same reason his *Brady* claim fails  *See Strickland*, 466 U S  at

10

*Brady* claim that "jurists of reason" would find debatable, and we therefore deny his request for a certificate of appealability [5]

## III

Baxter argues that his conviction on Count 1 was invalid in light of *Skilling v United States*, 561 U S  358 (2010)  Count 1 charged Baxter and others with conspiracy to commit offenses against the United States, in violation of 18 U S C  § 371  The count charged the following offenses as among the objects of the conspiracy  (1)  mail and wire fraud to obtain money and property, in violation of 18 U S C  §§ 1341 and 1343, and (2) mail and wire fraud to deprive the WTU of its intangible right to the defendants' honest services, in violation of 18 U S C  §§ 1341, 1343, and 1346 [6]  The judge instructed the jury that it

---

694 ("[T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution     "), *Montgomery v Bobby*, 654 F 3d 668, 679 n 4 (6th Cir  2011) ("[I]t is well settled that the test for prejudice under *Brady* and *Strickland* is the same " (internal quotation marks omitted))

[5] Baxter also contends that the district court abused its discretion in failing to grant an evidentiary hearing to develop his *Brady* claim  A "district judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the petitioner claims to have been prejudiced " *United States v Morrison*, 98 F 3d 619, 625 (D C Cir  1996), *accord United States v Toms*, 396 F 3d 427, 437 (D C Cir 2005)  We see no abuse of discretion and no warrant for granting a certificate of appealability on this issue

[6] As the Supreme Court explained in *Skilling* "The mail- and wire-fraud statutes criminalize the use of the mails or wires in

could find Baxter guilty if the government proved he conspired to commit any of the charged object offenses  J A  1528 [7]  And the verdict form allowed the jury to return a general verdict on Count 1, without specifying upon which object it had based the conspiracy conviction  *See* J A  254 [8]

In *Skilling*, the Supreme Court held that the honest-services fraud statute, which prohibits a "scheme or artifice to deprive another of the intangible right of honest services," 18 U S C § 1346, "proscribe[s] bribes and kickbacks -- and nothing more " *Skilling*, 561 U S at 410  The government had neither alleged nor proved that Skilling received bribes or kickbacks  *Id* at 413  "Because the indictment alleged three objects of the conspiracy -- honest-services wire fraud, money-or-property wire fraud, and securities fraud," the Court held that "Skilling's conviction [wa]s flawed " *Id* at 414  As the Court noted,

---

[7] furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ' 18 U S C § 1341 (mail fraud), § 1343 (wire fraud)  The honest-services statute, § 1346, defines 'the term "scheme or artifice to defraud"' in these provisions to include 'a scheme or artifice to deprive another of the intangible right of honest services '" 561 U S at 369 n 1

[7]"[T]he government is entitled to prove criminal acts in the disjunctive, notwithstanding that the indictment charges them in the conjunctive " *United States v Coughlin*, 610 F 3d 89, 106 (D C Cir 2010) (citing *Griffin v United States*, 502 U S 46, 56-60 (1991))

[8]Although the parties discuss Count 1 as if it merely charged a conspiracy to commit fraud (by wire and mail), it also charged as objects of the conspiracy embezzlement from a labor organization, in violation of 29 U S C § 501(c), and making false statements in violation of 18 U S C § 1001  Because the parties do not focus their arguments on these objects, we do not discuss them

12

"constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory " *Id* (citing *Yates v United States*, 354 U S 298 (1957)) The Court did not vacate Skilling's conviction, however, because errors of this "variety are subject to harmless-error analysis " *Id* Instead, it remanded the case for the court of appeals to determine whether the error was harmless *Id* at 414 & n 46

As in *Skilling*, it is undisputed that the scheme at issue in this case involved neither bribes nor kickbacks, and that the judge did not instruct the jury that honest-services fraud was so limited Moreover, like Skilling's jury, Baxter's was instructed on alternative theories of guilt and returned a general verdict on Count 1 that may have rested on the legally invalid honest-services fraud theory Accordingly, Baxter maintains that his conviction on Count 1 constituted constitutional error under *Skilling*[9]

1 As we noted above, Baxter may not take an appeal on this issue unless we grant a certificate of appealability, and we may do so only if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional

---

[9]Baxter contends that his convictions on the counts of substantive mail and wire fraud violations were also erroneous because they were tainted by the invalidity of the Count 1 conspiracy count That is so, he says, because on those counts the trial court instructed the jury that it could convict him of foreseeable offenses committed by his coconspirators during the course of the conspiracy, pursuant to *Pinkerton v United States*, 328 U S 640 (1946) J A 1529 We do not reach this contention in light of the disposition we reach on his challenge to Count 1

13

right " *Slack*, 529 U S at 478 [10] Baxter points to *Skilling* as demonstrating that his trial was tainted by constitutional error because of the possibility that the jury rested its verdict on the honest-services fraud theory of conspiracy   While the government contends that the court's instruction on honest-services fraud amounted to harmless error because the flawed instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Hedgepeth v Pulido*, 555 U S 57, 58 (2008) (internal quotation marks omitted), we conclude that jurists of reason would find debatable whether the submission of the invalid honest-services theory to the jury was harmless   We therefore grant the certificate of appealability

2  Although we grant a certificate of appealability, there is another hurdle that Baxter must overcome before we can address the merits of his appeal  Baxter did not challenge his conviction on the honest-services fraud theory at trial or on direct appeal  As a consequence, he "procedurally defaulted the claim he now

---

[10]*Slack* also held that, "when the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue      if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling " *Id* (emphasis added)  Although there was a procedural default in this case, *see infra* Part III 2, the district court did not deny the § 2255 motion on procedural grounds, and we therefore consider only the first prong of the *Slack* test in deciding whether to grant a certificate of appealability

presses on us " *Bousley v United States*, 523 U S  614, 621 (1998), *see id* at 620-22 [11]

In *Bousley*, the Court explained that, "[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either [1] 'cause' and actual 'prejudice,' or [2] that he is 'actually innocent '" *Id*  at 622 (citations omitted), *see also McQuiggin v Perkins*, 133 S Ct  1924, 1931-32 (2013)  Baxter does not argue that there was a "cause" that excused the procedural default [12]  Instead, he relies on the "actual innocence" exception, contending that his innocence of fraud on the honest services theory suffices to excuse his procedural default

---

[11]The government does not assert that Baxter also defaulted his claim on timeliness grounds, as it does with respect to his *Adefehinti* claim, *see infra* Part IV  Rather, it concedes that Baxter's claim based on *Skilling*, which was not decided until June 2010, was timely  Gov't Br  4 & n 4

[12]The fact that the Supreme Court had not yet decided *Skilling* at the time of Baxter's 2005 trial or 2008 direct appeal is insufficient to demonstrate "cause "  As the Court explained in *Bousley*, "[w]hile we have held that a claim that 'is so novel that its legal basis is not reasonably available to counsel' may constitute cause for a procedural default,     petitioner's claim does not qualify as such [because the claim]     was most surely not a novel one "  523 U S  at 622  It was not novel, the Court said, because "the Federal Reporters were replete with cases involving" such challenges  *Id*  The same was true at the time of Baxter's trial regarding the *Skilling*-like claim that he raises here  *See, e g*, *United States v Rybicki*, 354 F 3d 124, 144 (2d Cir 2003) (en banc), *United States v Welch*, 327 F 3d 1081, 1106 (10th Cir 2003), *United States v Easton*, 54 F  App'x 242, 243-44 (8th Cir 2002), *United States v Frost*, 125 F 3d 346, 371 (6th Cir  1997), *id* at 370 n 7 (collecting cases)

In response, the government again contends that the *Skilling* error was harmless  Gov't Br  22  This contention, however, puts the cart before the horse because we cannot address the merits of Baxter's *Skilling* claim unless he overcomes his procedural default  We therefore begin (and end) with the question of Baxter's actual innocence

"To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him "  *Bousley*, 523 U S at 623 (internal quotation marks omitted), *see United States v Caso*, 723 F 3d 215, 218-19 (D C  Cir  2013)  But convicted him of what?  In all previous "actual innocence" cases except *Bousley* (which we discuss below), the Supreme Court has required the petitioner to demonstrate his actual innocence of the offense of which he was convicted [13]

Although the Court has not yet considered the meaning of "actual innocence" in the context of a case in which a jury returned a general verdict when instructed on alternative theories of guilt, the rationale for the "actual innocence" exception to procedural default dictates that the defendant must show his

---

[13]*See, e g , McQuiggin*, 133 S  Ct  at 1936 (remanding for further proceedings to determine whether the petitioner's challenge to his murder conviction met the actual innocence standard), *Schlup v Delo*, 513 U S  298, 332 (1995) (same), *House v Bell*, 547 U S  518, 555 (2006) (concluding that the petitioner made the requisite showing of actual innocence regarding his murder conviction to overcome procedural default), *see also Sawyer v  Whitley*, 505 U S  333, 340 (1992) ("A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime ")

16

innocence of each of the alternative theories [14] As the court explained in *McQuiggin*, "[t]his rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons " 133 S Ct at 1931 (quoting *Herrera*, 506 U S at 404) Or, as the Court put it in *McCleskey v Zant*, the exception is designed to excuse procedural barriers to relief in only a "narrow class" of "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime " 499 U S 467, 494 (1991) Unless Baxter can show that he is innocent of *both* money-and-property fraud *and* honest-services fraud, he cannot show that the *Skilling* error "probably has caused the conviction of one innocent of the crime" of

---

[14]This is true at least when conviction on each of the other theories would lead to the same or a greater sentence than conviction on the invalid theory   *See Caso*, 723 F 3d at 223 (stating, in the context of evaluating an offense the government forwent because of a plea bargain, that "we should not require a person to spend 30 years in prison on an erroneous     conviction because he was guilty of [a less serious] offense that would carry a [lesser] sentence ")   In this case, there is no claim that conviction on a money-and-property theory would have led to a different (or lesser) sentence than conviction on an honest-services theory   *See* Baxter Presentence Investigation Report ¶¶ 46-47 (grouping the conspiracy count, the substantive counts that were its objects, and the money laundering counts together "because    the offense level is determined largely on the basis of the total amount of harm or loss", noting that, in those circumstances, the "offense level applicable to the Group is the offense level corresponding to the aggregated quantity" and that the court is to apply "the offense guideline that produces the highest offense level", and concluding that the money laundering conspiracy count produced the highest offense level)

which he was convicted namely, conspiring to commit mail and wire fraud Moreover, if we were to apply the exception whenever any one of several alternative theories of fraud were ruled invalid, it would no longer remain, as the Court contemplated, a "rare" exception "only applied in the extraordinary case," *id* at 321 *See McQuiggin*, 133 S Ct at 1928 (noting that the "standard is 'demanding' and seldom met" (quoting *House*, 547 U S at 538))

*Bousley* considered what a defendant must show to prove his "actual innocence" when he pled guilty pursuant to a plea agreement, rather than -- as in the Court's other cases -- when he was convicted after a trial Kenneth Bousley pled guilty to "using" a firearm during a drug trafficking crime in violation of 18 U S C § 924(c)(1), a provision that makes it unlawful to use *or* carry a firearm during such a crime After the Supreme Court clarified that "using" means "active employment," *see Bailey v United States*, 516 U S 137, 143 (1995), Bousley supported his 28 U S C. § 2255 motion with a claim that his guilty plea was involuntary because he had been misinformed about the elements of the § 924(c)(1) offense The Court held that, although Bousley had procedurally defaulted his challenge by failing to raise it on direct appeal, a court could still review his claim in habeas if he could establish his actual innocence of the offense to which he pled guilty *Bousley*, 523 U S at 622-23 Moreover, the Court stated that, "[i]n cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges " *Id* at 624

In *Bousley*, the government argued that the petitioner should have to demonstrate that he was actually innocent of both "using" and "carrying" a firearm in violation of § 924(c)(1) The Court rejected the argument, holding that he need demonstrate only that he did not "use" the firearm as defined in

18

*Bailey*, 523 U S at 624  It did so, the Court said, because "petitioner's indictment charged him only with 'using' firearms in violation of § 924(c)(1)    [a]nd there [wa]s no record evidence that the Government elected not to charge petitioner with 'carrying' a firearm in exchange for his plea of guilty " *Id*  In Baxter's case, by contrast, the indictment charged alternative means of violating the charged statute   It charged him with conspiring to commit mail and wire fraud on both honest-services *and* money-and-property theories  J A 225-26  Thus, *Bousley* further supports the conclusion that Baxter must demonstrate his actual innocence of both objects of the conspiracy [15]

Baxter maintains that he should not have to demonstrate his actual innocence of money-and-property fraud because we cannot be sure that his jury did not convict him on the invalid honest-services theory   Thus, he argues, the instruction had a "'substantial and injurious effect or influence in determining the jury's verdict '" Baxter Br 37 (quoting *Hedgpeth*, 555 U S at 58)  But this is the standard for harmful error on the merits, *see Hedgpeth*, 555 U S at 58, not for the actual innocence required to overcome a procedural bar  The type of "actual innocence" claim that Baxter presses is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits '" *Schlup*, 513 U S at 315 (quoting *Herrera*, 506

---

[15]In *Caso*, we suggested that the most likely rationale for *Bousley*'s rule -- that the showing of actual innocence must extend to more serious, and likely equally serious, charges forgone in exchange for a plea bargain -- is that the rule ensures "the defendant does not receive an unjustified 'windfall '" *Caso*, 723 F 3d at 223 (quoting *Lewis v Peterson*, 329 F 3d 934, 936 (7th Cir 2003))  This rationale applies *a fortiori* to alternative theories of an offense upon which a defendant was actually charged and convicted

U S at 404) Without a demonstration of actual "innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim " *Id* at 316

In sum, we conclude that, to establish "actual innocence" to overcome his procedural default, Baxter must demonstrate that "it is more likely than not that no reasonable juror would have convicted him" of the offense of which he was convicted, *Bousley*, 523 U S at 623 (internal quotation marks omitted) That offense was conspiracy to commit either honest-services fraud *or* money-or-property fraud, and Baxter must demonstrate his actual innocence of that offense

3 Baxter cannot show that it is more likely than not that he was actually innocent of conspiracy to commit money-or-property fraud Indeed, Baxter's briefs say nothing in support of such a showing, other than to declare that he "was not stealing money and/or property from the WTU," Baxter Br 30, and that he "obtained nothing to which he was not entitled as Treasurer " Reply Br 21 The evidence is entirely to the contrary, as we laid out in Part I above, and as we said in our decision on Baxter's direct appeal

> For approximately seven years, Bullock, Hemphill, Baxter, and friends appropriated for their own benefit much of the money union members paid as dues They embezzled these funds through several channels, including American Express (Amex) cards issued on WTU's account, checks written for fraudulent purposes and for excessive amounts, and payments to a front company, Expressions Unlimited All union checks required two signatures, those of Bullock and Baxter, the union's president and treasurer

20

respectively  These two, therefore, had the key to the union treasury

Initially, Bullock and Baxter simply used their WTU Amex cards for personal expenses, and they spent quite a lot   But the thefts became more audacious when Hemphill was hired as Bullock's secretary  and  then  also  became  the  union's bookkeeper

Between 1995 and 2002, the conspirators stole millions of dollars from WTU and spent it on such things as a $50,000 silver set for Bullock's house, a wedding reception for Hemphill's son, $29,000 in dental work for her and her husband, $19,000 in Washington Wizards tickets for Baxter and Bullock, car insurance for him, and art for his house  Sometimes they simply wrote themselves checks from the union treasury  After WTU received an infusion of cash from the inflated assessment in 2002, Hemphill and Baxter wrote themselves more checks totaling $18,805 and $31,000, respectively

514 F 3d at 1354  Baxter's briefs neither say anything, nor point to any evidence, that would cause us to reach a different conclusion here than we did on direct appeal

In sum, although it is clear that Baxter was innocent of conspiring to commit honest-services fraud because the scheme did not involve bribery or kickbacks, it is equally clear that he cannot show he was actually innocent of conspiracy to commit money-or-property fraud  Accordingly, he cannot overcome the procedural default that bars us from considering his *Skilling* claim on the merits

21

IV

Finally, Baxter contends that his conviction for money laundering under 18 U S C § 1956(a)(1)(B)(i) was invalid in light of this court's decision in *United States v Adefehinti*, 510 F 3d 319 (D C Cir 2007)

Once again, Baxter requires a certificate of appealability to proceed and, once again, we grant it  *See supra* Part III 1 Baxter's *Adefehinti* claim, while not explicit, appears to be that he was convicted under a legally invalid theory of money laundering because the alleged money laundering was not distinct from the crimes that produced the funds that were laundered  This would make his *Adefehinti* claim similar to his *Skilling* claim  *See Skilling*, 561 U S at 414 ("[C]onstitutional error occurs when a jury    returns a general verdict that may rest on a legally invalid theory ")  The underlying question of what legally constitutes money laundering is a difficult one, and we therefore conclude that "jurists of reason would find it debatable whether [Baxter's] petition states a valid claim of the denial of a constitutional right," *Slack*, 529 U S at 478  *See Adefehinti*, 510 F 3d at 322 ("It seems clear that     the necessary intent to conceal requires 'something more' than the mere transfer of unlawfully obtained funds, though that "'something more" is hard to articulate '" (quoting *United States v Esterman*, 324 F 3d 565, 572 (7th Cir 2003)))

But Baxter again faces another hurdle  Under AEDPA, Baxter had one year from "the date on which [his] judgment of conviction bec[ame] final" to file his § 2255 motion  28 U S C § 2255(f)(1)  Baxter agrees that his conviction became final on November 10, 2008, the date the Supreme Court denied his petition for a writ of certiorari  *See United States v Aguirre-Ganceda*, 592 F 3d 1043, 1045 (9th Cir 2010) (agreeing with "the seven other circuits that have reached th[e]

issue" that a conviction becomes final when a petition for certiorari is denied, not when a subsequent petition for rehearing is denied) But he did not file the motion until more than a year after that date, not until January 11, 2010, thus rendering his filing untimely

Although Baxter acknowledges that his motion was untimely, he maintains that he is entitled to equitable tolling A federal habeas petitioner "is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing" *McQuiggin*, 133 S Ct at 1931 (quoting, inter alia, *Holland v Florida*, 560 U S 631, 649 (2010)) (internal quotation marks omitted), *see United States v McDade*, 699 F 3d 499, 503 (D C Cir 2012)  The only circumstance that Baxter proffers is that he "relied on orders entered by the district judge" that enlarged the time for filing until July 15, 2010  Baxter Br 27-28  But the district court did not enter that order until January 14, 2010, two months after the filing deadline had passed and three days after Baxter filed his motion  *See* Order on Motion for Leave to File, *United States v Baxter*, No 03-CR-516 (D D C Jan 14, 2010)  Needless to say, Baxter could not have let the deadline pass in reliance upon an order that the court had not yet entered

Although he has procedurally defaulted, that is, yet again, not the end of the matter  In *McQuiggin v Perkins*, the Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar      or      expiration of the statute of limitations" contained in AEDPA  133 S Ct at 1928  Baxter maintains that he is, in fact, actually innocent of "money laundering" under 18 U S C § 1956  As we said above, to demonstrate actual innocence, "the petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no

23

reasonable juror would have convicted him" of that offense, *Bousley*, 523 U S at 623 (quoting *Schlup*, 513 U S at 327-28), *see Caso*, 723 F 3d at 218-19  Thus, the Supreme Court "stress[ed]" in *McQuiggin*, is a "demanding" standard  133 S Ct at 1936

The provision of the money laundering statute at issue in Baxter's case applies to

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts    such a financial transaction which in fact involves the proceeds of specified unlawful activity--    (B) knowing that the transaction is designed in whole or in part-- (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

18  U S C  § 1956(a)(1)(B)(i)    Baxter's claim of actual innocence rests on our statement in *Adefehinti* that the "'transaction or transactions that created the criminally derived proceeds must be distinct from the money laundering transaction '" Baxter Br 41 (quoting *Adefehinti*, 510 F 3d at 324)[16] In other words, to launder money, a defendant must have money to launder  Or, as the statute says, a money laundering

---

[16]*See also Adefehinti*, 510 F 3d at 322 ("The money laundering statute    has no application to the transparent division or deposit of [illegally obtained] proceeds "), *id* at 324 ("Having carried out a fraud of which concealment was an integral part, defendants cannot be charged with the same concealment a second time, as if it were the sort of independent manipulation of the proceeds required for money laundering ")

24

transaction must "in fact involve[] the proceeds of specified unlawful activity." 18 U S C § 1956(a)(1)

Because he seeks to invoke the actual innocence exception to the statute of limitations in 28 U S C § 2255(f), Baxter bears the burden to show actual, "factual innocence." *Bousley*, 523 U S at 623-24 But he has made no serious attempt to pinpoint what a reasonable juror would -- or would not -- consider proceeds and why subsequent transactions involving those proceeds could not manifest an intent "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds," as required by § 1956(a)(1)(B)(i) The treatment of the subject in Baxter's opening brief covers less than a page It merely recites the elements of money laundering and then claims that "no matter how the facts are twisted, the transactions that created the criminally derived proceeds are not separate and distinct from the money laundering transaction." Baxter Br 41 Because he does not revisit the claim in his reply brief at all, this one sentence constitutes his entire argument on the subject

Without more, we cannot conclude that it is more likely than not that no reasonable juror would find an intent to conceal based on transactions that took place after proceeds existed For example, Baxter signed WTU checks that initially went to a front company, Expressions Unlimited, and to a frontman, LeRoy Holmes Hemphill and Bullock then instructed the fronts to transfer the proceeds to Bullock's personal account before she paid her WTU credit card bills out of her supposedly personal funds *See supra* Part I A reasonable juror could conclude that those transactions involved unlawful proceeds and that those transfers by the fronts were designed to conceal the money's illicit origins Such a juror might infer that the conspirators feared that direct payment of such bills out of the fronts' accounts might stir the curiosity of a vigilant WTU employee or external auditor reviewing credit card statements, more so than

would portraying the payment as merely that of an employee paying her personal expenses out of her personal account Baxter's terse briefing of the issue fails to explain why such an inference by a juror would be unreasonable, and we cannot independently verify its reasonableness because Baxter has presented such a meager and non-analytical account of the evidence

Accordingly, we cannot say it is more likely than not that no reasonable juror would have found the requisite concealment in transactions occurring after proceeds existed  Indeed, we note that, on direct appeal, Baxter and Hemphill raised a nearly identical argument -- that they could not be convicted of money laundering because the government did not prove that the transactions creating the proceeds were distinct from the transactions laundering them  *See* Baxter Br 30-32, Hemphill Br 52-55, *Hemphill*, 514 F 3d 1350 (D C Cir 2008) (No 06-3089) [17]  In response, we concluded, tersely, that there was "abundant proof of the acts of concealment "  *Hemphill*, 514 F 3d at 1362 [18]  In effect, then, we have already concluded that

---

[17]*See also* Baxter *Hemphill* Br  32 ("In short, the Government's theory at trial impermissibly allowed the jury to commingle the initial transactions that formed the basis of the unlawful activity with the transactions that 'washed' those illegal proceeds 'clean'" (quoting *United States v Seward*, 272 F 3d 831, 836 (7th Cir 2001))), Hemphill *Hemphill* Br  55 ("[I]n effect, the Government claimed that it could prove embezzlement and have it punished as money laundering ")   Although Baxter's *Hemphill* brief did not cite *Adefehinti* (which issued after oral argument in *Hemphill* but before the opinion was released), it did cite *United States v Seward*, 272 F 3d at 836, a case upon which *Adefehinti* relied for the same proposition *See Adefehinti*, 510 F 3d at 324

[18]Although this portion of the *Hemphill* opinion was addressed to Hemphill's money laundering challenge, Baxter expressly joined that

26

a reasonable juror could have found Baxter guilty of money laundering   Baxter's briefing of the issue on this appeal provides no support -- and no reference at all to relevant evidence -- for the opposite proposition  As a consequence, he has failed to shoulder his burden to show the actual innocence required to overcome his untimely filing

## V

For the foregoing reasons, we conclude that Baxter is not entitled to relief  The judgment of the district court is

*Affirmed*

---

portion of her brief  *See* Baxter *Hemphill* Br  16 n 1